UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AAKASH DALAL,** | **Civil Action No. 20-1434 (MCA) (LDW)** |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **JOHN L. MOLINELLI, et al.,** | |
| **Defendants.** | |

This matter comes before the Court on a motion for summary judgment brought by the United States, Special Agents Corey Coleman, Ajit David, and Tara Jerussi, former Special Agent James Spence, and former Assistant U.S. Attorney Jud Welle ("Federal Defendants"), and a motion for summary judgment brought by Prosecutor John L. Molinelli, Prosecutor John Higgins, Prosecutor Martin Delaney, Lieutenant Robert Anzilotti, and Detective James Costello ("State Defendants"). Both sets of Defendants seek summary judgment on Plaintiff Dalal Aakash's Amended Complaint, which asserts claims under 42 U.S.C. § 1983, the New Jersey Civil Rights Act ("NJCRA"), the Federal Tort Claims Act ("FTCA"), and state tort law. For the reasons explained below, the motions for summary judgment are GRANTED.

I.    **FACTUAL BACKGROUND[1] & PROCEDURAL HISTORY**

This action arises from an alleged intergovernmental conspiracy between the Federal and State Defendants to manufacture criminal charges against Plaintiff in order to prevent his release on bail while he awaited trial on a separate indictment stemming from his involvement in a series

---

[1] The Court reviews the evidence at summary judgment in the light most favorable to Plaintiff; however, Plaintiff's 71-paragraph Counterstatement of Material Facts includes many facts that are irrelevant to the legal issues before the Court, and the Court omits those facts from its recitation.

of attacks on synagogues and a Jewish community center. *See Dalal v. Molinelli*, No. 20-14342021 WL 1208901, at *1 (D.N.J. Mar. 30, 2021) (citing Amended Complaint).

### a. The First Indictment and Plaintiff's Successful Bail Appeal

In January 2012, the Bergen County Prosecutor's Office ("BCPO") and the Federal Bureau of Investigation ("FBI") formed the Bergen County Hate Crimes Taskforce and began investigating incidents of arson and vandalism at Bergen County area synagogues. *See* Plaintiff Counterstatement of Undisputed Material Facts ("CSUMF") ¶ 1; State Response to Plaintiff's CUMF ("State RSUMF") ¶ 1; Federal Response to Plaintiff's CUMF ("Fed. RSUMF") ¶ 1. As the result of this investigation the BCPO charged Dalal (as well as co-conspirator Anthony Graziano) with conspiracy, arson, attempted arson, and bias intimidation in connection with a series of incidents in which Dalal and a co-defendant attacked four synagogues and a Jewish community center in Bergen County, New Jersey. *See State v. Dalal*, 221 N.J. 601, 603 (2015) ("*Dalal II*"); *see also* FBI 0027-29, FBI 0585-611.

During the relevant time period, John L. Molinelli was the Bergen County Prosecutor, John L. Higgins was the BCPO's First Assistant Prosecutor, and Martin Delaney was Chief Assistant Prosecutor of the Arson Unit and led the investigation. CSUMF ¶ 1, State RSUMF ¶ 1, Fed. RSUMF ¶ 1. Detective Robert Anzilotti was the Lieutenant in Charge of the Major Crimes Unit, and Detective James Costello was the case detective. *Id.* FBI Special Agent James Spence was assigned to the task force on a full time basis. *Id.*

On January 24, 2012, Graziano was charged and arrested in connection with the attacks and detained at the Bergen County Jail. CSUMF ¶ 2, State RSUMF ¶ 2, Fed. RSUMF ¶ 2.

On February 9 or 10, 2012, SA Spence and Det. Anzilotti interviewed Plaintiff at the FBI's Newark Field Office. CSUMF ¶ 3; State RSUMF ¶ 3 (noting that Det Anzilotti did not recall the

meeting); Fed. RSUMF ¶ 3.  On February 13-14, 2012, FBI Special Agent Coleman was assigned to investigate Plaintiff.  CSUMF ¶ 4; Fed. RSUMF ¶ 4;  SA Coleman spoke to BCPO detectives and BCPO Detective Gil Breit, exchanged records with the BCPO, and surveilled Plaintiff on February 22, 2012.  *Id.*

Law enforcement, including SA Coleman and BCPO Detective Costello, arrested Dalal at his apartment on March 2, 2012.  CSUMF ¶ 5; State RSUMF ¶ 5, Fed. RSUMF ¶ 5; *see also* Fed. DSUMF at ¶ 8 (citing FBI 0027-28).

The same day, former Superior Court Judge Liliana DeAvila-Silebi remanded Dalal to the Bergen County Jail ("BCJ") and set initial cash bail at $2.5 million.  *Id.*  Dalal could not post bail, and Judge Silebi denied Plaintiff's motion to reduce bail on March 21, 2012. CSUMF ¶ 7, State RSUMF ¶ 7, Fed. RSUMF ¶ 7.

On or about April 25, 2012, Plaintiff filed an emergency application with the Appellate Division to reduce his bail.  CSUMF ¶ 10, State RSUMF ¶ 10, Fed. RSUMF ¶ 10.  On May 1, 2023, the Appellate Division granted Plaintiff's motion for emergent relief, summarily reversing and remanding the bail decision, and instructing the trial court to explain its reasons under the factors set out in New Jersey Court Rules. *See id.*  A second bail hearing occurred on May 4, 2012 before Judge Roma, who denied the reduction.  *Id.*

On May 21, 2012, Dalal filed a second application for emergency relief Appellate Division, seeking an immediate reduction in his bail.  CSUMF ¶ 11, State RSUMF ¶ 11, Fed. RSUMF ¶ 11.  On May 22, 2012, the Appellate Division reduced bail to $1 million without a 10% cash option and remanded to the trial court for consideration of additional conditions.  CSUMF ¶ 12, State RSUMF ¶ 12, Fed. RSUMF ¶ 12.

On June 21, 2012, Plaintiff's defense counsel wrote to advise the trial court that the bail package would consist of $710,000 in cash and $290,000 in real property. *See* Pl. Exh. 40. A bail hearing was set for June 27, 2012 at 9 a.m. *See id.* Plaintiff contends that the BCPO had not objected to his bail source documentation, that he and his family appeared at Bergen County Superior Court in Hackensack, New Jersey, for his bail source hearing, and that he was scheduled to be released that day. CSUMF ¶ 12. Plaintiff, however, was not released on bail. Instead, as discussed in more detail below, he faced a new set of charges that he made terroristic threats and conspired with a jail informant to purchase a firearm for an unlawful purpose and murder Prosecutor Delaney.

### b. The Federal Defendants Investigate Whendel Stewart's Letter and Monitor Plaintiff's Bail Proceedings with the State Defendants

Approximately five months earlier, on January 24, 2012, the same day Graziano was arrested, Immigration and Customs Enforcement ("ICE") transferred immigration detainee Whendel Stewart to the Bergen County Jail. *See* Federal Exhibit F, ICE_61-62. Stewart had been excluded from detention at the Essex and Hudson County Jails for disciplinary reasons, including: (1) "Verbal Assault on a Female Corrections Officer (while at Essex County Jail)" and (2) "Detainee Intimidation (while at Hudson County Jail)." *See* ICE_2.

On or about May 8, 2012, the FBI received a copy of a handwritten letter sent by Stewart to his Immigration Judge Leo Finston. Fed. DSUMF at ¶ 9 (citing Coleman Response to Int. No. 16 ¶ 17; FBI 1462-64 (the "Stewart Letter"); State DSUMF ¶¶ 17-18). The Stewart letter was mailed from Bergen County Jail. Fed. DSUMF ¶ 12 (citing Stewart Letter; ICE 0061-62). The Stewart letter is dated April 10, 2012 in two places, and also includes a handwritten notation with the date February 13, 2012, and bears a stamp showing that it was received by the Immigration Court. *Id.*

In the letter, Stewart states that he is housed with Plaintiff and speaks to him every day. *See* Stewart Letter at 1. According to Stewart, Dalal is "always telling [him] how much he hate[s] the government [and] the Jewish People." *Id.* Stewart also alleges in the letter that Dalal has plans to blow up the Federal Building on Broad Street in Newark, where the immigration court is located, and the FBI building in Newark. *See id.* Stewart states that Dalal was being held on bail in the amount of 2.5 million and is trying to post bail so that he can carry out the attacks. *Id.* at 1-2. Stewart also states that he is being truthful and not providing "false information" and further states that his purpose is to warn the Judge that the Judge might be in danger. *Id.*

Plaintiff contends that SA Coleman, SA Spence, FBI Special Agent Tara Jerussi, and AUSA Lawrence Judson Welle fabricated the Stewart Letter and falsely claimed that Stewart wrote it. CSUMF ¶ 13; *see also* Plaintiff's Responsive Statement of Material Facts ("Pl. RSUMF") ¶¶ 17-18 (claiming the Stewart Letter is fabricated and that Defendants cannot prove Stewart sent it). Plaintiff also implies throughout his submissions that the Federal Defendants planted Stewart at BCJ. The Federal Defendants dispute these allegations and contend that federal law enforcement agencies learned of the Stewart Letter and investigated the alleged threats. *See* Fed. RSUMF ¶ 13.

According to the Federal Defendants, at the time the FBI received the letter, "Whendel Stewart was unknown to Coleman or any other member of FBI Newark's counter-terrorism task force." Fed. DSUMF ¶ 10 (citing Coleman Response to Int. No. 16 ¶ 17). To Coleman's knowledge, Stewart had no prior history as a confidential human source or informant. *Id.* (citing Coleman Written Dep. ¶ 21). Coleman and others at the FBI took steps to assess the validity of Stewart's letter. Fed. DSUMF at ¶ 14 (citing Coleman Response to Int. No. 16 ¶¶ 17-18; Coleman Written Dep. ¶¶ 13-29).

On or around May 8, 2012, Coleman and the FBI involved the United States Attorney's Office ("USAO") in Newark, which assigned AUSA Welle to the investigation of Stewart's allegations. DSUMF ¶ 15 (citing Welle Response to Int. No. 16). Welle opened a domestic terrorism file on the matter on May 10, 2012. *Id.* (citing USAO_0173-0176).

The FBI conducted a series of interviews with Stewart and prepared written reports referred to as "FBI 302s." It is undisputed that none of these interviews were recorded. *See* CSUMF ¶¶ 19. SA Jerussi and Special Agent Sharon Serra interviewed Stewart on May 14, 2012, and prepared a written report. Fed. DSUMF ¶ 16 (citing FBI 0922-923). Among other things, Stewart reported conversations with Dalal about "extremist, anti-government views"; Dalal's "in-depth technical knowledge regarding bomb making" including knowledge "about chemicals and other components required to make a bomb." *Id.* "Dalal talked about wanting to blow up the federal building on Broad Street and the Newark FBI Building," mentioning the use of C-4. *Id.* Specifically, Dalal "claimed that he would use a government car or possibly an explosive suicide vest strapped to another person." *Id.* Stewart also reported that Dalal discussed the underground parking lot at the FBI building and using that in connection with a bombing plot. *Id.* Stewart reported that Dalal provided him with lists of chemicals he needed for explosives and also asked about obtaining a contraband cellphone and firearms. *Id.*

As early as the May 14, 2012 interview, Stewart claimed that Dalal was also interested in killing specific individuals, including state prosecutors.

> Conversations would often turn to DALAL talking about how the Essex County Prosecutor and the Bergen County Prosecutor are "Ruining his life. Everybody is ruining his life." DALAL stated that he wants to kill them both. DALAL also wants to kill the writer of the news article regarding his case. DALAL mentioned that he knows [name omitted] is the head of the Newark FBI building that DALAL wants to take down as well."

*Id.*

Stewart also insisted that he was not a "Snitch," but "when DALAL started to tell him specifics about the federal building on Broad Street and FBI building in Newark, STEWART became concerned out of his respect for Honorable Judge Leo Finstan [sic]." *See* FBI 0922-923. Stewart also "felt that information about terrorism was different than criminal matters." *Id.* When asked by the agents why Plaintiff felt comfortable talking to Stewart about his thoughts and plans, Stewart stated that he assumed Dalal believed that Stewart hated the United States because Stewart was not from this country. *Id.*

On May 22, 2012, SA Spence learned from Lt. Anzilotti that Plaintiff's bail had been reduced to one million dollars, and he communicated this information to AUSA Welle. *See* Pl. Exh. 34. On May 23, 2012, Welle and SA Coleman spoke by telephone. *See* Pl. Exh. 33. Pursuant to Welle's notes from that call, Coleman was in not in touch with Plaintiff's "prosecution team" but was in touch with a detective at BCJ. *Id.* Coleman had arranged to be contacted immediately if Plaintiff were to be released from BCJ. *Id.*

On June 1, 2012, Coleman and an agent from ICE interviewed Stewart at BCJ. Fed. DSUMF ¶ 18 (citing Coleman Response to Int. No. 16 ¶ 22). Coleman's report of this interview was transcribed on June 21, 2012. *See* FBI 0905-906. In that interview, Stewart claimed that Dalal (a) asked for assistance obtaining a contraband cellphone which Dalal could use to "do more damage if he gets access to the internet"; (b) stated that he can obtain blueprints to any building; (c) stated that he had obtained military training abroad; and (d) stated that, upon making bail, he planned to abscond to the Cayman Islands to flee prosecution and avoid extradition. Fed. DSUMF ¶ 18 (citing FBI 0905-906). Stewart also told the agents that Dalal had these conversations with Stewart during recreation, which occurred twice a day for 1.5 hour periods. *See* FBI 0905-906.

At the June 1, 2012 meeting, SA Coleman and Stewart discussed possible benefits Stewart could (and could not) receive for his cooperation and arranged a future meeting to formalize Stewart's working relationship with the government:

> STEWART mentioned wanting to assist the government in regards to DALAL. STEWART was informed his cooperation was greatly appreciated, and an agreement outlining the working relationship between STEWART and the federal government would have to be formalized. STEWART was informed the current charges he faces would not be dismissed or modified, however other requests would be delivered to the Assistant United States Attorney (AUSA) for review. STEWART agreed to a future meeting in which a discussion regarding formalizing a working relationship would occur.

*See* FBI 0905-906. At this meeting, Stewart also told SA Coleman about his immigration status and desire to stay in the United States. *See* Plf. Exh. 6, Coleman Dep. at Q. 173 ("Whendel Stewart mentioned his immigration status and his desire to stay in the USA during the first interview I conducted with him.").

On June 4, 2012, the FBI converted the investigation from a preliminary investigation into a full field investigation. Fed. DSUMF at ¶ 19 (citing Coleman Response to Int. No. 16 ¶ 23).

On or around June 7, 2012, AUSA Welle spoke with counsel at ICE about Stewart, and confirmed that Stewart was subject to a final order of removal, which Stewart was appealing. Fed. DSUMF ¶ 20 (citing USAO_0311). Welle also learned that ICE placed Stewart at BCJ—"rather than ICE's usual detention facilities"—because of disciplinary issues. Fed. DSUMF ¶ 21 (citing *id.*)

It is undisputed that the Federal and State Defendants communicated throughout the month of June regarding the possibility that Plaintiff may make bail. On or around June 7, 2012, AUSA Welle communicated with Delaney and requested information about prior searches of Dalal's dwelling. Fed. DSUMF ¶ 22 (citing USAO_0313); *see also* Pl. Exh. 38. Also on June 7, 2012, Spence sent an email to multiple recipients, including Delaney, Coleman, and Coleman's

supervisor, Special Agent Scott Nawrocki, informing them that he learned from the BCPO that Dalal's father was expected to post $1 million in bail through a lien on real property and asking Delaney to "let us know asap if he makes bail." *See* Pl. Exh. 37. Delaney responded: "I will keep you posted." *Id.* On June 11, 2012, Welle wrote an email thanking Delaney for forwarding the Indictment and reminding him to keep him informed as to whether Plaintiff makes bail and the timing. Pl. Exh. 39. Delaney responded that he would keep Welle posted. *See id.* The FBI and the USAO also communicated through email about Dalal's upcoming bail hearing and Plaintiff's alleged threats to the federal buildings. *See* Fed. DSUMF at ¶ 23 (citing USAO_0285). On June 21, 2012, Spence and Delaney again communicated about Dalal's upcoming bail hearing. *See* USAO_0372-373. Delaney informed Spence that a bail hearing was scheduled for Wednesday [June 27, 2012] at 9 a.m. *Id.*

On June 21, 2012, SA Coleman and SA Jerussi interviewed Stewart again at the FBI offices. Fed. DSUMF ¶ 24 (citing Coleman Response to Int. No. 16 ¶ 23; FBI 0893-894). During this interview, Stewart provided details about Dalal's alleged interest in killing "Assistant Prosecutor Martin Delaney" and asking Stewart to help him obtain semi-automatic firearms.[2] *Id.* (citing FBI 0893-894). With respect to the Dalal's alleged threat to kill Delaney and desire to obtain firearms, Stewart provided the following detailed allegations:

> Dalal wrote down his name and an email address, gave it to
> Stewart, and directed Stewart "to have his sister contact Dalal via

---

[2] According to Stewart, Dalal expressed a desire to kill other individuals, including an individual in FBI executive management and reported that Dalal expected to be released on bail very soon using money and property. *See* FBI 0893-894. Stewart also claimed during this meeting that Plaintiff told Stewart he had traveled extensively and received weapons training in Ukraine, not Korea, as Stewart previously stated. *Id.* Stewart reported that Dalal told him that money and property would be used as collateral for his bail, which had already been posted. *Id.* Dalal allegedly also told Stewart he "would wait a month or two before doing anything because DALAL knows the government will be watching him." *Id.*

> email once Dalal was out on bail." *Id.* On a piece of paper, DALAL
> wrote the words "Assistant Prosecutor Martin Delaney" and gave it
> to STEWART. STEWART asked him "What is this"? DALAL said,
> that is the first person he is going to kill when he gets out of jail.
> DALAL asked STEWART if he could get a Glock 19 and an AR-15
> for him. STEWART confirmed he could get those guns for DALAL,
> the Glock 19 would cost between $300-$400. STEWART told
> DALAL, his sister would have to complete the transaction since
> STEWART was in jail. After hearing this, DALAL gave STEWART
> a piece of paper, written on it was DALAL'S name and email
> address ad@unelected.org. DALAL told STEWART to have his
> sister contact DALAL via email once DALAL was out on bail.

*See* FBI 0893-894. Stewart provided the notes with Delaney's name and Plaintiff's email address

to the FBI agents, and they placed it in the file. *See id.* In his deposition, Plaintiff denies writing

the handwritten notes. *See* Fed. Def. Ex. O. at 49:3-50:17 ("I didn't write those documents"). In

his Certification submitted in support of summary judgment, Plaintiff contends that the pieces of

paper were fabricated by Coleman and Jerussi. *See* Pl. Cert. ¶ 3.

The June 21, 2012 FBI 302 Report stated the following about Stewart's motives for

assisting the government and what he was hoping to gain in return:

> STEWART is not expecting to receive anything for assisting
> the FBI. STEWART believes DALAL is capable of doing something
> catastrophic, and STEWART wants to keep his family safe.
> STEWART mentioned not understanding how the guilty plea
> entered would affect his legal status in the UNITED STATES.
> STEWART desires to withdraw his guilty plea and fight the case in
> court. STEWART would appreciate any assistance provided.

*See id.*

On June 21, 2012, Coleman shared details from the Stewart interview with BCPO.[3] Fed.

DSUMF ¶ 25 (citing Coleman Response to Int. No. 16 ¶ 25); *see also* Pl. Exh. 42 (indicating that

Coleman told Gil Breit about the threat to Delaney on June 21, 2012).

---

[3] In a statement taken on July 19, 2013, Delaney stated that he was notified of the Plaintiff's threat
by Det. Breit in June 2012, took the threat seriously, and feared for his own safety and the safety
of his family. *See* Fed. Exh. E1 at 4.

On June 25, 2012, SA Coleman and SA Ajit David interviewed Stewart again in the FBI offices.[4] Fed. DSUMF ¶ 26 (citing Coleman Response to Int. No. 16 ¶ 26; FBI 1018). *Id.* (citing David Responses to Int. No. 11-12). In that interview, Stewart reiterated his claim that Dalal believes Stewart hates the United States because ICE is trying to deport him and is also under the impression that Stewart will be released in a few months and will not be deported. *See* FBI_1018. Stewart also claimed that Dalal wanted to "meet up" with Stewart once Stewart gets out of jail. *Id.* Stewart also claimed that Dalal again spoke about attacking an individual in FBI executive management as well as hacking activities once released on bail. *Id.* Stewart further claimed that Dalal suggested that Stewart could be paid "to kill some people." *Id.*

On June 25, 2012, Stewart agreed to become a confidential human source for the FBI and "was instructed to solicit information regarding any plots or plans to conduct future criminal activity." Fed. DSUMF ¶ 27 (citing Coleman Response to Int. No. 16 ¶ 27). The FBI notified the Bergen County Sheriff's Office of the plan to use Stewart to record conversations with Dalal. (*Id.*) Prior to opening Stewart as a source, SA Coleman admits he reviewed Stewart's criminal history and was aware of Stewart's "extensive criminal history," included a conviction for aggravated assault, and that he was a "Blood gang member." *See* Coleman Written Dep. ¶¶ 22-25. Coleman believed Stewart was "likely to be reliable as a source" and considered "reliable" to be synonymous with "credible." Coleman Written Dep. ¶¶ 29-30; *see also* USMS _013 (USMS Inspector Paul Safier noted in his June 27, 2012 Report that "[a]n initial assessment regarding the validity and credibility o[f] the SOI has been conducted with a favorable outcome.")

---

[4] In his opposition brief, Plaintiff withdrew his claims against David and the Court deems all claims against David as withdrawn.

Coleman also acknowledges that he told Stewart in June 2012 that Stewart "might be compensated financially" for acting as an informant; however, Coleman contends that he did not promise Stewart financial compensation or a fixed amount. Fed. DSUMF ¶ 30 (citing Coleman Written Dep. ¶¶ 9-11). Coleman paid Stewart $1000 for acting as an informant and is not aware of any other money paid to Stewart by the FBI. Coleman Written Dep. ¶ 12. The parties appear to agree that the FBI did not actually pay Stewart until February 2013. *See* Plf. Response to Fed. DSUMF ¶ 45 (agreeing with date of payment).

SA Coleman, SA Jerrusi, SA David, and two other FBI agents brought Stewart to the FBI's Newark Field Office, gave him two body recorders, instructed him on how to use them, and instructed him to "solicit intelligence" from Plaintiff regarding "plots to attack/bomb federal buildings, murder federal/local law enforcement, and purchase of firearms."[5] *See* Pl. Exh. 44 (citing FBI_858).

Prior to Stewart recording conversations with Dalal, AUSA Welle advised SA Coleman "that he should direct Stewart not to ask Plaintiff about his pending criminal charges, and to change the subject if Plaintiff started to talk about those charges." *See* DSUMF ¶ 28 (citing Welle Response to Int. No. 15). In a June 26, 2012 email, Welle memorialized an earlier conversation with Coleman in which he advised that any operation that involves undercover or confidential informant communication with Plaintiff must carried out in such a way that results in a complete and reliable recording communication and that any recorded communication must be preserved

---

[5] The record also includes a document titled "Approval for Electronic Monitoring," which was authored by Coleman and dated June 25, 2012. *See* Pl. Exh. 43 (FBI_1518-20). The document states that Stewart is an inmate at BCJ who "regularly communicates" with Dalal and that Dalal has threatened to blow up federal buildings and that his main target is Martin Delaney. The Authorization also states that Dalal has asked Stewart to obtain a gun for him to use after he gets out of jail and that Dalal has a bail hearing on June 27, 2012. *See id.*

for later disclosure to the defense under Rule 16 of the Federal Rules of Criminal Procedure. Welle also advised Coleman to avoid channels of communication that are not susceptible to reliable recording and preservation. *Id.* (citing USAO_0388).

On June 26, 2012, USMS Inspector Paul Safier learned about Plaintiff's bail hearing scheduled for the following morning; Safier sent an email to SA Coleman, Andrew Kogan, and Thomas Maltese requesting to be notified if Plaintiff was released on bail so Safier could notify security personnel at the federal buildings. *See* Pl. Exh. 49 (USAO 381). Andrew Kogan forwarded the email to AUSA Welle, stating "FYI. I already called Paul [Safier]." *Id.* In response, Welle sent an email to Coleman advising him to "brief USMS and other equities telephonically or in person because, as the case agent, all your written communications on this will likely be discoverable." *Id.*

### c. Stewart Records Conversations with Plaintiff on June 25 and June 26, 2012

Stewart recorded conversations with Dalal on June 25 and 26, 2012. Fed. DSUMF ¶ 29 (citing Coleman Response to Int. No. 16 ¶ 28). Stewart returned the recording devices to the FBI on June 26, 2012, noting he had several exchanges with Dalal. Fed. DSUMF ¶ 31 (citing Coleman Response to Int. No. 16 ¶ 28).

On June 26 through June 27, 2012, SA Coleman and Det. Breit listened to the audio recordings, and Coleman transcribed portions of the transcript. *See* Coleman's Resp. to Interrog. at ¶ 29 (citing FBI_1053-1076); *see also* Coleman's Written Dep. ¶¶ 78-79. Coleman contends that he transcribed portions of the recordings that he found "concerning in nature." Fed. DSUMF ¶ 31 (citing *Id.* ¶ 29; Coleman Written Dep. ¶¶ 80-82). The record contains the "draft" and "official" transcripts of those recorded conversations. *See* FBI_1053- FBI_1071. The transcribed

recordings between Stewart and Dalal begin with a conversation about Dalal's desire to obtain a firearm after he is released on bail:

> 06/25/2012
> 15:53:58
>
> C:    We really need to take care of some business.
>
> D:    What business?
>
> C:    Huh?
>
> D:    What business?
>
> C:    As far as the mother fuckin like, I[']m gonna need some money when I get out of here, you feel me?
>
> D:    Oh yeah?
>
> C:    I[']m gonna need some money when I get out of here but
>
> D:    I[']m gonna need some money when I get out of here too.
>
> C:    I know but you told me, that um, if you help me out with some money, I would have to do something for you?
>
> D:    Yeah.
>
> C:    So, I mean, you getting out and, and, then what in 2 days?
>
> D:    Yeah, anyway I can get that, uh, that (Unintelligible), from you, I might need that P228.
>
> C:    You said what, P228?
>
> D:    Is that what you have?
>
> C:    No, the P89.
>
> D:    P89
>
> C:    9mm, 9mm.
>
> D:    (Unintelligible)
>
> C:    That's 9mm.
>
> D:    You said you're, you said your cousin is in the navy?
>
> C:    Yeah.
>
> D:    Does he have some other shit?
>
> C:    He umm, he um, he got um M-16

D:     I[']m looking at handguns.[6]

C:     Oh, right now I got, I got a few at my house right now. D: Yeah, but are they hot?

C:     Nah, nah, nah, nah, nah, nah, nah, these inside of boxes and shit, inside the boxes, man you ever heard of P89 Luger?

D:     Yeah

C:     Yeah so 9mm, that's what Im talking about

D:     Yeah

C:     So you gonna have to call Monica, call my sister, and she will, Im sayin how you all gonna meet up?[7]

D:     I don't know yet.

C:     You go to my house or whatever. D: (Unintelligible)

. . . .

C:     Hey yo, look man, so how much, how much? Just give her 300 for that, the um P89.

D:     300 for the huh?

C:     The P89.

D:     You know what I might just do, I might just get my own, through my connections, because I don't know where that gun has been.

C:     It's been in a box.

D:     Brand new?

C:     Brand new, brand new, 2 clips and everything, brand new, when you see it, you can take it or not, but brand new.

D:     Alright, I'll think about it, I'll think about it later.

C:     And far as, far as the umm AR-15's, how many of those you gonna need?

D:     I don't know, none yet.

C:     None yet?

---

[6] Dalal contends that he did not say "I'm looking at handguns" and what he says in the recording is inaudible. *See* Plaintiff's Certification at ¶ 9.

[7] Dalal and Stewart spoke two more times in the transcribed recordings about contacting Stewart's sister. In the first exchange, Dalal tells Stewart he would contact her in two or three months. *See* FBI_1072-1073. In the second exchange the next day Stewart reminds him to call his sister. *See* FBI_1067.

D:      I don't need anything like that yet, I just need something for self defense.

C:      Oh, you gonna wait to get that when I get out?

D:      Im gonna wait for like a year, till all this is over.

C:      Till all this, oh so.....

D:      (Unintelligible), self defense

C:      Oh so basically you just waitin.

D:      Nah I have (Unintelligible), they didn't get everything they didn't get everything.

C:      But they, but, they did get your 2 guns you had though in the house?

D:      They got 2 of them.

C:      2?

D:      Yeah

C:      Damn[8]

. . . .

FBI_1066-1069.

In the next transcribed recording, Stewart asked Dalal how much he would pay him and told Dalal he "know[s] how to shoot." Dalal stated cryptically: "[w]ell, are you willing to go out there and we'll talk about if after I'm out," but Dalal also stated that "this is not the place." *See* FBI_1069-1070. Similarly, when Stewart told Dalal he needed to get paid and asked: "How much for one?", Dalal told him "Can't talk about that here, man, when we get out, when we get out, we can discuss it." *See* FBI_1073. Dalal was also equivocal when Stewart asked him about a prior conversation about how to make C-4, stating "I can't tell you here, I don't even remember how, even if I wanted to tell you I couldn't, I don't remember." *See* FBI_1073. The following day,

---

[8] Plaintiff then tells Stewart that he was charged with weapons offenses based on the two guns found in his home.

Stewart asks Dalal: "How long you teach me military training? Dalal responds: "We'll discuss that when I'm out, I'm not discussing that in here[.]" *See* FBI_1075.

Plaintiff contends that portions of the transcribed recordings refute Stewart's claims that he intended to kill the anyone and show that he opposes violence in favor of working within the system and making laws. The relevant portions of this recorded conversation reads as follows:

19:13:13

C:    Look how they got you.

D:    (Unintelligible) 4 months

C:    Fuck up your whole life and everything.

D:    Pretty much, I'm gonna sue them though I have a good case.

C:    You got a good case against them?

D:    I have a good case against them, I can sue them for a few million, it's not going to matter in the long run, but get a few million out of them, that's millions that could have gone to you know cops, schools. I'll be happy if I destroy some of these fuckers, take their money.

C:    So you rather get money, or you rather torture them?

D:    I would rather get the money first, get the money and leave and then do what needs to be done.

C:    Torture their ass huh?

D:    Either you torture or you kidnap a few, (Unintelligible), torture and shit, but that's not going to work, that's not going to do much, that's only a few, you have to, you have to do it in the system, you have to work within the system, move up the ladder, become a politician, move up the ladder, get some political control, make your own laws.

C:    You know you was telling me before, how to get everybody together as one, get all the government together, when you take out one of them, they all come together as one.

D:    At the funeral.

C:    At the funeral.

*See* FBI_1071.

Plaintiff also highlights the fact that he did not make any threats against Delaney during the recordings and contends that Coleman and Breit intentionally failed to transcribe the following conversation:

| | |
|---|---|
| Stewart: | What's the name of your prosecutor? |
| Dalal: | My prosecutor? |
| Stewart: | Yeah. |
| Dalal: | Martin Delaney. |
| Stewart: | Barn Delaney? |
| Dalal: | Martin Delaney. |
| Stewart: | Oh, oh, Martin. |
| Dalal: | Delaney. |
| Stewart: | That's the one that just convict, well convict that dude that pleaded to thirty years? |
| Dalal: | Yeah. |
| Stewart: | That name sounds familiar. That's the same— |
| Dalal: | [inaudible] |
| Stewart: | Huh? |
| Dalal: | Martin Delaney? |
| Stewart: | That's the same person I saw in the papers. That's the same person I saw in the papers. |
| Dalal: | Yeah, because they put his name in the paper. |
| Stewart: | That was old boy's prosecutor. Yeah, that's what I'm saying, I, I, I remember seeing this inside a newspaper. |

CSUMF ¶ 30 (citing Audio Recordings).    Plaintiff emphasizes that Coleman noted this conversation in his handwritten notes. *See id.* (citing FBI_1320).  Coleman contends, however, that he did not transcribe this portion of the recording because he "did not consider it to be an item of concern." Coleman's Written Dep. ¶¶ 83-84.

Plaintiff further contends that Coleman and Breit omitted the only other reference to Delaney in the audio recording. In that portion, Plaintiff is not threatening Delaney and states that he will sue him:

| Stewart: | Damn man, you better hope you got everything ready because your prosecutor's gunning for you. |
|---|---|
| Dalal: | He's a dumbass though. |
| Stewart: | Your cases so you got everything to back up. How he look? |
| Dalal: | Huh? |
| Stewart: | White guy. Blond hair. |
| Stewart: | Blond hair. He old? |
| Dalal: | He's young. Probably in his forties. |
| Stewart: | He's trying to get his name famed off of you. |
| Dalal: | That's what it looks like. I already got a reversal against him. Actually I have two reversals. Just bail reduction hearings. I can sue him. Keeping you on an excessive bail is a violation of your Eighth Amendment rights. I can sue the judge and the prosecutor. |

CSUMF ¶ 32 (citing Audio Recordings).

Plaintiff also contends that he refused to hire Stewart as a hitman, as documented in this exchange:

| Stewart: | Like listen, I'm only going to charge you, like $5000 for one person, man. |
|---|---|
| Dalal: | That's not what you're going to be doing. |
| Stewart: | Huh? |
| Dalal: | That's not what you're going to be doing. That's a waste of time, man. That's not what you're going to be doing. |
| Stewart: | Listen man, you help me and I'll help you out, man. |
| Dalal: | That's not what you're going to be doing. |
| Stewart: | Why you say that? |
| Dalal: | That's not necessary. |

| Stewart: | No, I'm saying what we agreed to. |
| Dalal: | Yeah. |
| Stewart: | Feel me, but listen, man. |
| Dalal: | Trust me, it's going to be – that's not what it's going to be. That's not the way to go about things. |

CSUMF ¶ 33 (citing FBI _ 1062-1063; *see also* FBI_1073-1074).

Plaintiff also contends that Coleman inaccurately transcribed a portion of the transcript where Plaintiff allegedly says: "Terrorism is always good." Plaintiff contends that what he says is inaudible, and he recalls saying, "Stopping Terrorism is always good" (emphasis supplied) or something similar.[9]  *See* Plaintiff's Certification at ¶ 10 (citing FBI_1073-1075 and Audio Recordings).  The parties have not provided the Court with the audio recordings.

### d.  The June 27, 2012 Meeting and the Charging Decision

At approximately 9:30 a.m. on June 27, 2012, SA Coleman and his SA Nawrocki met with BCPO Prosecutor Higgins and Lt. Anzilotti. Pl. Exhibit 6, Coleman's Written Dep. ¶¶ 103-106. Coleman does not recall meeting with Costello that day.  Coleman's Written Dep. ¶ 142.  During the meeting, Coleman provided Higgins and Anzilotti with a draft transcript of the audio recordings, the original Stewart letter, and the FBI 302 reports from the June 1, June 21, and June 25 2012 interviews with Stewart. *See* Coleman Resp. to Interrog. 16 ¶ 30; Coleman's Written Dep. ¶¶ 115-117. Coleman believes he told Higgins and Anzilotti that he had reviewed the entire recordings. Coleman Written Dep. ¶ 125.  According to Coleman, Higgins found the information "concerning" and said that the BCPO would continue to review it and determine if new charges

---

[9] Plaintiff also contends that the recordings show that he could not have threatened to attack the federal building housing the immigration court because he had no knowledge of its location.  When Stewart and Plaintiff discussed Stewart's court date, Dalal asked him "How long was the ride?" Stewart responded, "from here to 970 Broad Street –" and Dalal asked "Where is that? New York City?" *See* CSUMF ¶ 32 (citing Audio Recordings).

could be brought against Plaintiff and would pass the information along to Molinelli. Coleman's Written Dep. ¶¶ 110, 113. Coleman stated that he and Nawrocki "had no input regarding what, if any, new state charges should be brought against Mr. Dalal." *Id.* ¶ 112.

Coleman stated in his written deposition answers that he did not recall that he (or SA Nawrocki) informed Higgins or Anzilotti that they viewed Stewart or the information Stewart provided as credible. *Id.* at ¶¶ 121-124; *see also* ¶ 143 (Coleman also states that he does not recall telling Costello that he viewed Stewart as credible). Noting the FBI's "strict protocols" to safeguard a source's identity, Coleman testified that he did not recall when Higgins or Anzilotti learned about Stewart's identity as the informant; nor did Coleman recall when Higgins and Anzilotti learned that Stewart was a member of the Bloods gang who had been ordered deported due to his extensive criminal history. *Id.* ¶¶ 126-128, 131. Coleman also did not recall informing Higgins or Anzilotti that Stewart had asked for deferred action with respect to his immigration case, that Stewart would be paid $1000.00 for wearing the recording device and soliciting information, and that Stewart had no history as an informant. *Id.* ¶¶ 129-130, 132. Finally, Coleman does not recall informing Higgins or Anzilotti about the portion of the audio recordings where Dalal and Stewart discuss Delaney. *Id.* at ¶¶ 134-135.

Prosecutor Higgins testified that as a supervisor in the legal chain, he was not involved in the investigation of the Delaney case, including the FBI investigation, but may have briefed by investigative staff as to status. Higgins Written Dep. ¶¶ 20-22. Higgins did not recall the meeting on June 27, 2012; he also did not recall any specifics about the Delaney case and lacked access to the case file. *Id.* at ¶¶ 18-200.

Lt. Anzilotti stated that his role in the Delaney investigation was mid-level supervision of detectives in the major crimes unit; at the time of his written deposition, he was no longer employed

with the BCPO and did not recall any specifics from the investigation, including the meeting with Coleman and Higgins on June 27, 2012. Pl. Exh. 4, Anzilotti Written Dep. ¶¶ 21-200.

Prosecutor Molinelli also had no recollection or knowledge of the June 27, 2012 meeting with the FBI or the documents exchanged during that meeting, *see* Molinelli Written Dep. ¶¶ 100-109, but he testified that he made the decision to charge Plaintiff using a "collective methodology utilized in the initial charges" *id.* ¶ 113, and "based upon collective work of senior members of the prosecution staff, with input of the law enforcement branch," *Id.* at ¶ 98. Molinelli also testified that "[d]ecisions on investigatory matters involves [sic] many people from both the prosecution and investigatory side[,] but I am responsible for the final decision on all charges, and I am sure the ultimate decision was mine."[10] *Id.* at ¶ 110. Molinelli surmises that he would have approved the initiation of charges in the presence of First Assistant Prosecutor Higgins and the Chief of Detectives. *Id.* at ¶ 142.

### e. Detective Costello Applies for the Warrants before Judge Silebi

It is undisputed that the State Defendants sought additional charges against Dalal, and, specifically, that Dalal 1) made terroristic threats, and conspired 2) to murder Prosecutor Delaney and 3) possess a firearm for an unlawful purpose. State Defendants' SUMF ¶ 31; Plaintiff's Responsive SUMF ¶ 31; Federal Defendants' Exhibit E. SONJ-BCPO-003-SONJ-BCPO-012; *see also Dalal II*, 221 N.J. at 604. It is undisputed that Det. Costello applied for the arrest warrant

---

[10] Delaney testified that he Breit notified him of the investigation, and he did not participate in the investigation and was notified of the charges and removed from the case. Delaney Written Dep. ¶¶ 127-132; 151.

before Judge Silebi on the morning of June 27, 2012,[11] but Costello does not recall presenting it,[12] and the record does not contain a written affidavit of probable cause or a recording of the oral application. *See id*; *see also* Costello Written Dep. ¶¶ 78-82.  Plaintiff contends that the State Defendants and Judge Silebi also failed to record the oral application. Pl. CSUMF ¶ 41.

On the same day, however, Costello also applied for a search warrant, which included a detailed affidavit of probable cause. *See* SONJ-BCPO-5047-SONJ-BCPO-5065.  The search warrant affidavit includes a lengthy history of the First Indictment as well as the basis for the new charges.[13]  *See* SONJ-BCPO-5062-SONJ-BCPO-5064.  Plaintiff contends that this document contains the "same distorted narrative [Costello] presented in support of probable cause for the arrest warrant." Pl. CSUMF ¶ 42.

It is undisputed that Judge Silebi signed the arrest and search warrants on June 27, 2012, and set a three million dollar bail for the new charges, which raised Plaintiff's total bail amount to four million dollars. *See* SONJ-BCPO-003-SONJ-BCPO-012.

### f.  The Search of Plaintiff's Cell & Post-Arrest Interviews

A search of Plaintiff cell recovered a number of documents that corroborate Stewart's claims.  In a certification submitted with his opposition brief,[14] Plaintiff contends that "to the best of [his] recollection, [he] did not write" the inculpatory documents that were recovered from his

---

[11] Plaintiff contends that Costello, Molinelli, and Higgins knew that Judge Silebi was a former BCPO prosecutor who had worked with Delaney and his wife. *See* CSUMF ¶ 40.

[12] Costello testified before the Grand Jury that he learned about the threats allegedly made by Plaintiff against Delaney at the end of June. Pl. Exh. 61, Grand Jury Tr. at 7.

[13] In its legal analysis, the Court reconstructs the relevant portion of the affidavit and does not reproduce the affidavit here.

[14] The State Defendants indicate that Plaintiff also testified in his deposition that these documents are "forgeries." ECF No. 24, State Def. Brief at 23 n. 3.

cell during the search on June 27, 2012."[15]  *See* Pl. Cert. ¶ 12.  Plaintiff further claims that "these

documents appear to be crude fabrications hastily crafted by Defendants." *Id.*  Plaintiff also notes

that the documents Stewart claimed Plaintiff had in his cell, i.e., Google Maps and Google Earth

documents, an article and picture of SA Michael Ward, blueprints, and Stewart's sister's phone

number, were not found in his cell.  *Id.*

Plaintiff further alleges in his Certification that he was dragged in chains and shackles and

transported to the BCPO investigative headquarters in Paramus, New Jersey.  Plaintiff's Cert. ¶

14.  Plaintiff claims that Lt. Anzilotti and Det. Costello "forcibly removed" Plaintiff from the

holding cell and brought him to an interrogation room.  Plaintiff asked to speak to counsel, but

Anzilotti turned on the audio-visual recording device and tried to coerce Plaintiff to sign a *Miranda*

waiver form, but he refused and continually asked to speak to his attorney.[16]  *Id.* at ¶ 15.  According

to Plaintiff,

> Both Anzilotti and Costello threatened to assault [Plaintiff] if [he]
> didn't confess to threatening Delaney.  They then shifted to offering

---

[15] The following items were found in Plaintiff's cell: 1. A document entitled Violence Against the State is Always Justified" (SONJ-BCPO-4909); 2. A page of notes stating the following: "When you're up against the state, in order to even the playing field, you must adopt guerrilla tactics" (SONJ-BCPO-4911); 3. A document titled "Necessary Targets" that listed "John Molinelli, prosecutor," "John L. Higgins III – 1st assistant prosecutor," "Frank Pucio, Executive Ass. Prosecutor," Steven Cuccinelli – Chief of Detectives," "Assistant Prosecutors Mary Ann Salem; Delaney" (SONJ-BCPO-4930); 4. A document titled "Dead Prosecutors=Freedom" (SONJ-BCPO-4930); 5. Notes on "TACTICS" including "SWATTING – USING THE STATE AGAINST ITSELF" and "RADIO DETON -> VEHICLE (PB); -> STRUCTURE (C4)" (see SONJ-BCPO-4912); 6. A plan titled "OPERATION BOOMING BEES" that involved "Attaching GPS to target vehicles underside, waiting for target vehicles to enter nest, radio detonation" and a schematic of the explosive device (SONJ-BCPO-4913-4914); 7. Plans to "compile dossiers" on various individuals including Martin Delaney, John Molinelli, James Costello, Lt. Anzilotti, and Michael Guzman (SONJ-BCPO-4987); 8. An "enemies" list that includes these same individuals, among others (SONJ-BCPO-4904, 4912); 9. Handwritten notes with "Martin Delaney" written on top and Delaney's office address and other contact information (SONJ-BCPO-4990). Notes with antisemitic views were also recovered from Plaintiff's cell. *See, e.g.*, SONJ-BCPO-4905-4908.

[16] Plaintiff claims that the State Defendants failed to produce these recordings in discovery. Pl. Cert ¶¶ 15, 30.

> to help [Plaintiff] in the synagogue case if [he] confessed to threatening Delaney. They both also stated that they knew that [Plaintiff] didn't threaten Delaney but that [Plaintiff] should just say [he] did, and that if [Plaintiff] did, they would assist [Plaintiff] in being released on bail.

*Id.*

Between 45 minutes to an hour later, Anzilotti and Costello forcibly moved Plaintiff to smaller room and forced him to sit on a stool. There were no recording devices in that room, and the two Defendants "cornered [Plaintiff], began lunging at [him], and appeared extremely frustrated, angry, and emotionally disturbed." *Id.* at ¶ 16. They alternately threatened Plaintiff and offered to help him get released on bail, as Plaintiff asked to speak to his attorney. Anzilotti told Plaintiff: "Your lawyer isn't coming here." Costello stated: "You think the Appellate Division is going to lower your bail again?" *Id.* Anzilotti and Costello also allegedly made disparaging remarks about Appellate Division Judge Ellen Koblitz, who had reduced Plaintiff's bail, hurled racial epithets at Plaintiff, and threatened to injure him. *Id.* The two Defendants allegedly tried to get Plaintiff to admit that he had threatened Delaney, but Plaintiff made no admissions, refused to answer their questions, and refused to sign a *Miranda* waiver. *Id.* at ¶¶ 17-18.

It is also undisputed that SA Jerussi and Task Force Officer Jason Krayl also interviewed Plaintiff after his rearrest and search. The report prepared by Jerussi and Krayl, which was written and signed on July 2, 2012,[17] states that Plaintiff "consented to waive his [Miranda] rights." *See* FBI_1748-1749. According to the report, Plaintiff denied interest in owning a gun but admitted researching explosives. *Id.* Plaintiff also purportedly admitted that he made threats against the FBI building because he was "badgered" and "intimidated" by other inmates and made these threatening comments to "bolster himself among his peers." *Id.* According to the report, Plaintiff

---

[17] The report appears to list the date of the interview as June 24, 2012, rather than June 27, 2012.

also stated that violence was against his moral code and that he had no intention of harming the Newark FBI building, its personnel, or Michael Ward. *Id.* Plaintiff also allegedly admitted that he lied to other inmates about receiving military training after inmates suggested that he was member of Al Qaeda; Plaintiff also allegedly admitted to lying about being affiliated with a Chicago anarchist group. *Id.*

With respect to the interview with Jerussi and Krayl, Plaintiff claims that he requested to speak with his attorney, and Krayl told Plaintiff he could call his attorney if he signed the Miranda waiver. Pl. Cert. ¶ 20. Plaintiff signed the *Miranda* waiver but claims that he refused to answer the agents' questions. *Id.* Plaintiff further claims that he "only stated that the Delaney charges were fabricated and that [he] had never threatened anyone or anything while at the Bergen County Jail, and a jury would never believe their bogus claim." *Id.* Plaintiff denies admitting to Jerussi and Krayl that he researched explosives or made threats against the FBI building and claims that the agents fabricated these admissions. *Id.* at ¶ 21.

### g. The Federal and State Defendants "Celebrate" the New Charges, but the Federal Defendants Decide not to Charge Plaintiff with any Federal Crimes

Plaintiff claims that, after the new charges were filed, the Federal and State Defendants also "celebrated their unlawful conduct" by emailing one another. On June 27, 2012, Welle emailed Eicher and Kogan to tell them he spoke with Coleman who indicated that Plaintiff was not going to be released because the BCPO secured an adjournment of the bail proceedings. Pl. Ex. 53, USAO_437. Eichner responded: "Great." *See id.* Molinelli issued a press release stating that Plaintiff would not be released on bail, Pl. Ex. 54, and on June 28, 2012, Det. Gil Breit emailed Nawrocki a copy of a NJ.com article, titled "Synagogue arson suspect now accused of plot to kill prosecutor[.]" Nawrocki forwarded that email to members of the Newark Counterterrorism Field Squad and wrote the following: "Corey's case. Thanks to Tara and Jason as well who conducted

the interview last night." Pl. Ex. 54, FBI_1732. Jerussi forwarded that email to three individuals with private email accounts. *Id.* On June 28, 2012, Coleman also completed an "Accomplishment Report" about his role in the investigation that led to the new charges. *See* Pl. Ex. 55, FBI_895-902.

On June 28, 2012, AUSA Welle recommended that the USAO not charge the Plaintiff with any federal crimes, because, in Welle's judgment, he did not believe the admissible evidence gathered to that date was sufficient to obtain a conviction of Plaintiff for a federal offense.[18] Welle's Resp. to Interrog. No. 11. According to Welle, none of the Federal Defendants took any investigative action after July 2012. Welle's Resp. to Interrog. No. 18. The Federal Defendants acknowledge that Coleman provided records of their investigation to the BCPO after this date and cite to FBI guidance that permits such information sharing. *See* Federal SUMF ¶¶ 44-50 (citing policy documents).

### h. Inspector Paul Safier's Reports

In discovery, the Federal Defendants also produced a series of threat assessment reports written by U.S. Marshals Service Senior Inspector Paul Safier. Plaintiff contends that the Safier Reports show that the Federal and State Defendants "privately" acknowledged that the state charges were "complete fabrications." Pl. CSUMF ¶ 52. The Federal Defendants dispute Plaintiff's characterization and contend that Safier's Report "shows the opposite." Fed. RSMF ¶ 51.

---

[18] To explain this decision, the Federal Defendants have provided policy documents on "grounds for commencing or declining prosecution", which state that "the attorney for the government should commence or recommend federal prosecution only if he/she believes that the person's conduct constitutes a federal offense and that the admissible evidence will probably be sufficient to obtain and sustain a conviction." Fed. SUMF ¶ 43 (citing Department of Justice, United States Attorney Manual § 9-27.220 (1997)).

On May 10, 2012, Safier was assigned to monitor the FBI's investigation and assist the FBI.[19] CSUMF ¶ 14, Fed. RSUMF ¶ 14. Inspector Safier wrote the threat assessment reports from May 10, 2012 through July 26, 2012. *See* Pl. Exh. 27 (citing USMS 1-17). The first report, which is dated May 10, 2012, focuses on Stewart's allegations in the April 10, 2012 letter and "the potential threat to multiple federal assets." *Id.* at 1. Safier determined that Dalal's threats were sufficient to trigger a protective investigation by the USMS because the USAO is housed in one of the federal buildings Dalal allegedly threatened to blow up. *See id.* Safier also noted that Dalal's statements to Stewart about blowing up two federal buildings "represent vague, uncorroborated, informant-sourced and ostensibly aspirational comments directed specifically at identified target facilities." *Id.* at 3. Safier further determined that it would be "premature to formulate any conclusions about the veracity of the statements" or determine if they were merely "aspirational venting." *Id.* at 4; *see also id.* at 5.

Inspector Safier also noted that Stewart was "facing deportation as an aggravated felon" and had a lengthy criminal history, including 14 arrests and eight convictions, "including robbery by force, simple and aggravated assaults, narcotic offenses, resisting arrest & hindering apprehension, domestic violence, threats to kill, and numerous counts of weapons possession, to include multiple instances in which he possessed a handgun and hollow point bullets." *Id.* After reviewing Dalal's alleged history of recruiting, influencing, and radicalizing others, and the current charges pending against him, Safier determined that the statements attributed to Dalal by Stewart

---

[19] It is undisputed that Inspector Safier has served with the USMS for over 30 years, and his primary responsibility is to conduct investigations and threat assessments that concern Marshals Service-protected persons and facilities, including federal buildings. *Id.*

were plausible; however Safier found that it was "equally possible" that the Stewart's claims about Dalal were unfounded:

> Conversely, due to the high-profile nature of the arsons, the proximity to and locus focus on Bergen County and the extensive media coverage which Dalal's crimes have received make it equally possible that Dalal is being proffered by the source as an unwitting instrument for some ulterior motive and selfish purpose Informant delivered threats are generally "low risk" as the information delivered is not directly sourced from the subject and generally not under his control. Exceptions to this general concept would be if the informant had a previous record of demonstrating proven reliability. In this case, STEWART is of untested reliability. In addition, information supplied by inmate informants is subject to additional scrutiny because inmate informants typically have strong motive to conflate, exaggerate, or otherwise embellish for their own purpose and benefit. Again in this instance, STEWART, a long-time resident of the United States since his youth, faces deportation. Since he is not an illegal alien or re-entry after deportation, but has committed the lesser transgression of failing to comply with the naturalization process, STEWART may be seeking to retain his ability to remain in the country trough [sic] some waiver or other consideration.

*Id.* at 4. Safier also noted that Dalal and Graziano were currently incarcerated and were unlikely to be released due to the high amount bail. *Id.* Safier further noted that they are alleged to have used low tech methods and focused on "soft targets," suggesting that they had limited resources and ability to carry out an attack on the federal buildings. *Id.* Safier concluded the following:

> At this time, based on the paucity of available information, high likelihood of aspirational venting, lack of apparent resources, and continued incarceration of the subject, the threat is currently assessed as "low risk." The lack of any corroboration, untested credibility of the source, and strong motivation by the source to overstate are additional factors relied upon in formulating this initial threat assessment.

*Id.* at 5.

On May 18, 2012, Inspector Safier wrote a second report after speaking with SA Coleman about the FBI's May 14, 2012 interview with Stewart, noting that the interview was conducted "to make a preliminary determination as to source credibility." *See* USMS 6. Safier also noted

Coleman did not attend the interview but verbally recited the results of the interview. *Id.* Safier stated the following:

> Agents determined that despite his extensive criminal history and strong and obvious motive to overstate matters, STEWART provided credible but limited information. STEWART acknowledged seeking a benefit for his cooperation, including consideration with his upcoming immigration matter. STEWART expressed a desire to remain in the United Staes and offered to wear a wire to obtain usable information against DALAL, Based upon his extensive criminal history, however, STEWART's ability to be useful in any investigation moving forward may be limited in nature.

*Id.* According to the Report, Stewart told the agents that Dalal made numerous statements about his desire to attack federal buildings through "some sort of incendiary attack" and mentioned a suicide vest and a vehicle borne explosive device (VBIED). (*Id.*) Safier reiterated that Dalal is unlikely to be released from custody and does not have any financial assets or internet capabilities, and appears to be communicating only with immediate family members. Safier also noted that the FBI intended to continue its investigation and may charge Dalal for bias crimes in connection with the synagogue bombings, and would seek to transfer him to federal custody if they choose to do so. *Id.* Safier reported that "[a]t this time, the FBI assesses DALAL has a very limited capacity and assesses that any threat to federal assets remains low." *Id.*

On June 13, 2012, Inspector Safier wrote a third report regarding the potential threat to federal assets. *See* USMS_8 at 1. Safier refers to Stewart as a source of information ("SOI") and documents information Stewart provided to ICE agents during the May 14, 2012 interview, including that Plaintiff "expressed a desire to target NJ state prosecutors in Bergen and Essex County as well as an identified FBI Official." *Id.* According to the Report, Stewart "further indicated that DALAL described additional opportunities to sow confusion and discord by

conducting secondary attacks which target attendees at subsequent wakes and funerals" and that Plaintiff claimed to be able to conduct attacks by installing GPS devices on government vehicles.[20]

On June 21, 2012, Inspector Safier also contacted Coleman who provided Safier with "the latest available intelligence[,]" which Safier memorialized in his report on that same date. *See* USMS 10. In that, Safier noted that that Stewart "continues to have good access to DALAL and was still interested in providing cooperation." *Id.* Safier also explained although Dalal claimed to have a large internet following, records indicated that he is only communicating with his attorney and his parents. And although Dalal's bail was reduced, "the family home has insufficient equity to post as collateral." *Id.* Safier concluded that the USAO "not seriously contemplating filing federal charges against DALAL for the previous Bergan County bias incidents and will defer to county authorities to prosecute those matters." Although it was possible that federal charges would be sought against Plaintiff in the future, Safier explained that that there was "no credible intelligence to suggest DALAL is actively planning with supporters to attack any building, federal asset or government official at this time." *Id.*

Inspector Safier wrote his final report on July 26, 2012, roughly a month after the new charges were filed against Plaintiff. Safier reviewed the history of the investigation, which led to the new charges and the removal of Stewart from BCJ for safety reasons. *See* USMS_15-16. Safier then explained that

> "active investigation into Dalal has effectively been suspended at this time, due to a variety of factors. Among those criteria were a lack of continued access to Dalal by the SOI or any other means; failure to acquire strong evidence of a specific or viable plot against federal assets during the investigation to date; and the decision of the Bergan County Prosecutors to charge Dalal with additional

---

[20] Safier also notes that Plaintiff's bail was recently reduced and further explains that "[i]t is expected that DALAL's father may attempt to secure his release by posting the equity in his Lodi residence. The FBI and ICE will be informed prior to Dalal's release should bail be made." *Id.*

crimes. The latter action resulted in the increase in bail and precluded his release from custody.

*Id.* Safier further explained that "it was previously determined that DALAL's ability to direct any plot while incarcerated was negligible and that any plans to conduct attacks while still incarcerated was almost wholly aspirational." Safier noted that Coleman provided "substantially similar information from the FBI's perspective." *Id.* Safier also explained that the further federal investigations were based on Dalal's release, which were now "moot" due to Dalal's continued incarceration. *Id.*

In his final report, Inspector Safier made the following recommendation:

> After conferring with S/A Coleman and AUSA Kogan, it was jointly determined that DALAL is not assessed to be a credible threat to any federal asset at this time. It is the recommendation of this district that the protective investigation is closed as "false/specious" at this time. Factors relied upon to support closure include, but are not limited to the following: The loss of access by the sole SOI, Dalal's continued and expected incarceration, lack of access to outside sources, and negative corroboration of any operational aspect of a developed or developing plot or plan by DALAL or anyone on his behalf.

*Id.* at USMS_17.

### i. **Stewart Continues to Act as an Informant Until he is Deported**

It is undisputed that Stewart was moved to a federal detention facility in Batavia, New York and provided SA Coleman with additional leads on New York inmates that Coleman forwarded to the New York FBI Office and the Internal Revenue Service. *See* CSUMF ¶ 56; Fed. RSUMF ¶ 56. It is also undisputed that Stewart called SA Coleman on March 27, 2013, and advised him that a fellow inmate was looking to hire him to arrange the murder of a witness in a federal death penalty case. *See id.* ¶ 57; RSUMF ¶ 57. A Buffalo FBI agent used Stewart as an informant against that federal inmate, provided him with a recording device, and instructed him not to discuss the underlying criminal case. *See id.* Because Stewart repeatedly failed to follow the agents'

instructions not to discuss the underlying case with the inmate, a federal Magistrate Judge later suppressed the evidence obtained by the government.[21]   Coleman testified in federal Court in Buffalo, New York on September 23, 2015, in connection with that matter, but he denies that he committed perjury when he said that Stewart provided accurate information, which resulted in the new charges against Plaintiff.  *See* CSUMF ¶ 60; RSUMF ¶ 60.

It appears undisputed that Stewart was initially granted deferred action at the request of the FBI, *see* Pl. Exh. 60, ICE_39, but Stewart was ultimately deported because "[t]he FBI . . . decided to withdraw this request and will not be taking custody of the alien."  *See id.*  SA Coleman stated in his written deposition that he believed that deferred action was withdrawn over concerns about Stewart's criminal history.  Coleman Written Dep. ¶¶ 176-177. Coleman also testified that he notified the BCPO once he knew Stewart would be deported that that Costello requested a delay in the deportation.  *Id.* at ¶¶ 178-181.  Stewart was removed from the United States on or about August 6, 2013.  *See* Pl. Exhibit 62.

### j.   Plaintiff is Indicted on Both Sets of State Charges

On March 1, 2013, a Bergen County grand jury returned the First Indictment charging Dalal with bias intimidation, criminal mischief, conspiracy to commit arson, aggravated arson, possession of a destructive device for an unlawful purpose, hindering apprehension, and terrorism associated with the attacks on the synagogues and Jewish community center.  *See State v. Dalal*, 438 N.J. Super. 156, 159-60 (App. Div. 2014) ("Dalal I").  On July 31, 2012, another Bergen County grand jury heard testimony regarding the new charges.  *See* Pl. Exhibit 61 at 1.  Costello testified for the state and read to the grand jury the contents of the Stewart Letter, portions of the FBI 302s, portions of the transcribed recordings, portions of the documents recovered from

---

[21] The Magistrate Judge noted that the FBI "deserves fault for continuing to use an informant who so flagrantly ignored . . . instructions the first time."  *See id.* at ¶ 59.

Plaintiff's cell during the search, and portions of Stewart's statement to Costello, taken on July 25, 2012 in Buffalo, New York. *See id.* at 5-66. On August 7, 2013, another Bergen County grand jury returned an indictment charging Dalal with conspiracy to murder Delaney, conspiracy to possess an assault firearm, and threatening to commit the murder of Delaney. *Id.* at 160; *see also* SONJ-BCPO-001-002. Based on the close timing of the Second Indictment and Stewart's deportation, Plaintiff contends that the state delayed the grand jury presentation until Stewart was deported so the grand jury could not call Stewart to testify; he also claims that the Second Indictment is based on the same fabricated evidence used to secure the charges. *See* CSUMF ¶¶ 54-55.

On February 18, 2014, the New Jersey Superior Court denied Dalal's motion to dismiss the Second Indictment and rejected Dalal's argument that the State provided insufficient evidence to the grand jury. *See* SONJ-BCPO-208-209 (portion of hearing transcript at SONJ-BCPO-172-233).

### k.  The State Dismisses the Second Indictment following Plaintiff's Conviction on the First Indictment

After the new charges were filed, it is undisputed that Plaintiff was moved to solitary confinement at BCJ, where he claims he experienced medical and mental health problems, including a stroke.[22] *See* CUMF ¶ 53; State RSMF ¶ 53; Federal RSMF ¶ 53 (noting, however, that Plaintiff has not provided medical evidence of his health problems).

In fall 2016, the State of New Jersey tried the First Indictment against Plaintiff before a jury in New Jersey Superior Court. *See, e.g., State v. Dalal*, No. A-5556-16, 2021 WL 1424114, at *3 (N.J. App. Apr. 15, 2021). On November 1, 2016, the jury in Superior Court found Dalal and his codefendant Graziano guilty on multiple charges, including first-degree terrorism, first degree aggravated arson, first degree conspiracy to commit arson, and first degree bias intimidation. *See*

---

[22] Plaintiff did not bring conditions of confinement claims in this action.

*State v. Dalal*, 252 A.3d 204, 207 (App. Div. 2021). Dalal and his co-defendant each faced a mandatory minimum sentence of 30 years without parole eligibility, with the possibility of a longer sentence. *Dalal*, 252 A.3d at 220-21. After Plaintiff was tried and convicted on the First Indictment, he contends that he refused a plea offer of time served on the firearm charge in the Second Indictment. *See* Pl. Cert. ¶ 22.

In 2017, prior to Dalal's sentencing for his synagogue bombing convictions, BCPO considered whether to proceed with the prosecution of the Second Indictment. *See* SONJ-BCPO-4931-4934 (BCPO dismissal memorandum). The prosecutor assigned to the case argued internally for dismissal of the Second Indictment noting that (a) obtaining leave from the federal government to return Whendel Stewart to the United States could be substantially challenging, burdensome, and expensive for Bergen County; and (b) Dalal faced a sentence of 30 years to life for his convictions in the synagogue bombing case. *See id.* The BCPO prosecutor pointed to the challenges of proving charges beyond a reasonable doubt without Stewart's participation. *Id.* The assistant prosecutor sought dismissal of the charge "[b]ased on the difficulty in getting Stewart to the US, the costs and burdens of completing that task, as well as defendant Dalal's expected NJSP exposure on the first trial (30 years to life)." *See id.*

On April 4, 2017, the Hon. Joseph V. Isabella, J.S.C. (ret.) dismissed the terroristic threats and murder conspiracy charge, leaving only Count 2 of the Indictment, the conspiracy to possess a firearm charge. *See* Plaintiff's Exh. 66 (SONJ-BCPO-050-51). On June 2, 2017, approximately five years after the charges were filed, the State moved to dismiss the remaining criminal charge and the state court granted that motion. Fed. SUMF ¶ 60.

On July 28, 2017, the Superior Court sentenced Dalal to a 35 year term of incarceration in the synagogue bombing matter, 30 years of which were ineligible for parole consideration. In the

sentencing hearing, the Superior Court Judge noted that Dalal had 1,964 days of jail time credit applicable to his sentence. *See* SONJ-BCPO-1896; SONJ-BCPO-1837-1897.

### I. Procedural History

On or about May 31, 2019, Plaintiff submitted a complaint in state court, and it was stamped received by the state court on or about July 22, 2019. ECF No. 1-1 at 8, 35. The Federal Defendants removed this action to federal court on February 12, 2020. ECF No. 1. On March 21, 2021, the Court granted in part and denied in part the Federal and State Defendants' motions to dismiss Plaintiff's Amended Complaint.[23] ECF Nos. 58-59. The Court also sua sponte dismissed the claims against Judge Silebi on the basis of judicial immunity, ECF No. 60, and granted the motion to dismiss the County of Bergen and Michael Saudino. ECF No. 61. The Federal and State Defendants answered as to the surviving claims, ECF Nos. 79, 80, and discovery commenced.

On September 8, 2023, the Federal and State Defendants filed separate motions for summary judgment. ECF Nos. 220, 222. After receiving several extensions of time, Plaintiff filed his opposition papers on February 6, 2024. ECF No. 240. On March 18, 2024, the State Defendants filed their reply brief. ECF No. 259. After receiving an extension of time, the Federal Defendants filed a reply brief on March 18, 2024. ECF Nos. 260-61. Plaintiff filed a motion to submit a sur-reply brief, with a copy of the sur-reply brief attached. ECF No. 268. The Court considers Plaintiff's sur-reply brief and exhibits in deciding the motions and terminates that motion. The Court has also resolved Plaintiff's discovery appeals, and the motions are ready to be decided.

---

[23] The State and Federal Defendants appealed the Court's Order, ECF Nos. 66-67, but those appeals were dismissed pursuant to Fed. R. App. P. 42(b) on September 15, 2021. *See* ECF No. 70.

## II.    <u>STANDARD OF REVIEW</u>

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (citing *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014); *see also* Fed. R. Civ. P. 56(a). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (quotations omitted); Fed. R. Civ. P. 56(a).

It is well established that the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal citation omitted). The moving party may also meet its burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) (quotations and citations omitted).

Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248. "If reasonable minds could differ as to the import of the evidence," summary judgment is not appropriate. *See id.* at 250-51. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III.   **DISCUSSION**

The Court begins with the Fourteenth Amendment fabrication of evidence claims, the Fourth Amendment malicious prosecution claims, and the conspiracy claims—which Plaintiff brings pursuant to §1983 and the NJCRA.[24] As explained in more detail below, the record evidence at summary judgment does not support Plaintiff's theory of a vast intergovernmental conspiracy. Plaintiff fails to meet the stringent standard for a Fourteenth Amendment fabrication of evidence claim and, among other deficiencies, also fails to show that the State Defendants lacked probable cause to arrest and prosecute him on the new charges, a necessary elements of a malicious prosecution claim. Finally, Plaintiff fails to show that the Federal and State Defendants engaged in a conspiracy under § 1983 to deprive him of his constitutional rights. As such, State and Federal

---

[24] The NJCRA protects federal rights and substantive rights under New Jersey's Constitution. *See Gormley v. Wood-El*, 218 N.J. 72, 97 (2014) ("Section 1983 applies only to deprivations of federal rights, whereas N.J.S.A. 10:6-1 to -2 applies not only to federal rights but also to substantive rights guaranteed by New Jersey's Constitution and laws."). The NJCRA is typically treated as the state court analog to § 1983. The parties have not argued that the standards for fabrication of evidence, malicious prosecution, or civil conspiracy are different under § 1983 and the NJCRA, and the Court considers them together.

Defendants are entitled to summary judgment on the § 1983 and NJCRA claims.[25]  The Court also grants summary judgment on the FTCA and state law claims.

### a. Fourteenth Amendment Fabrication of Evidence Claims

The Third Circuit has recognized a standalone claim for fabrication of evidence, arising under the procedural due process component of the Fourteenth Amendment.[26]  *See Mervilus v. Union Cnty.*, 73 F.4th 185, 193–94 (3d Cir. 2023); *Black v. Montgomery Cty.*, 835 F.3d 358, 369 (3d Cir. 2016); *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014).  "Such a claim stands alone because it need not be tied to a malicious prosecution claim." *Deforte v. Borough of Worthington*, 364 F. Supp.3d 458, 480 (W.D. Pa., 2019) (citing *Halsey*, 750 F.3d at 292).  A plaintiff may have a claim based on fabrication of evidence whether she has been convicted or acquitted at trial. *Black*, 835 F.3d at 371.

Thus far, the Third Circuit has addressed fabrication of evidence as a stand-alone claim only where the defendant(s) have used the fabricated evidence at trial. *See Mervilus*, 73 F.4th at 193–94 ("[I]f a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment.") (quoting *Halsey*, 750 F.3d at 294).  As explained by the Third Circuit in *Mervilus*, F.4th at 193-94,

> The Fourteenth Amendment is the constitutional source of a fabrication claim for two reasons.  First, its due process guarantee ensures criminal defendants a fair trial.  *See Black v. Montgomery Cnty.*, 835 F.3d 358, 370 (3d Cir. 2016) ("Fabricated evidence is an

---

[25] Because a reasonable jury could not find that the State or Federal Defendants violated Plaintiff's constitutional rights, the State and Federal Defendants are also entitled to qualified immunity on the first prong. *See Karkalas v. Marks*, 845 F. App'x. 114, 120 (3d Cir. 2021) (citing *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002) ("If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity.").

[26] The Due Process Clause of the Fourteenth Amendment prohibits the states from depriving any person of life, liberty, or property without due process of law. U.S. CONST. amend. XIV, § 1.

> affront to due process of law, and state actors seeking to frame
> citizens undermine fundamental fairness and are responsible for
> 'corruption of the truth-seeking function of the trial process.'"
> (quoting *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 49
> L.Ed.2d 342 (1976))). Second, it guards against unlawful seizures
> post-conviction. *See Halsey*, 750 F.3d at 291 (explaining that the
> Fourth Amendment protects liberty interests only until trial, and the
> Fourteenth Amendment protects against unlawful seizures "through
> and after trial.").

*Id.*; *see also Halsey*, 750 F.3d at 293 ("We emphatically reject the notion that due process of law permits the police to frame suspects."). It is not clear, however, that a plaintiff may bring a Fourteenth Amendment claim for fabrication of evidence where, as here, he was neither convicted nor acquitted of the charges at issue, and the alleged fabricated evidence was never used at trial. *See, e.g., Wright v. City of Philadelphia*, 229 F.Supp.3d 322, 331 (E.D. Pa. 2017) ("A fabrication of evidence claim, which the Third Circuit Court of Appeals acknowledged as a tort distinct from malicious prosecution, results from the prosecution's *use at trial* of fabricated evidence.") (emphasis in original) (citing *Halsey*, 750 F.3d at 294).

To establish a fabrication-of-evidence claim, a plaintiff must show there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged." *Black*, 835 F.3d at 372. To meet the "reasonable likelihood" standard, the plaintiff must establish a "meaningful connection" between the due process injury and the use of fabricated evidence. *Id.* The plaintiff must also establish "that the fabricated evidence 'was so significant that it could have affected the outcome of the criminal case.'" *Black*, 835 F.3d at 372 (quoting *Halsey*, 750 F.3d at 295). Further, there is a "notable bar" for whether evidence was fabricated. *Id.* at 372. "[T]estimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong." *Halsey*, 750 F.3d at 295. Rather, a "fabrication-of-evidence claim requires persuasive evidence [the defendant] formulated or submitted false

evidence willfully, knowingly, or with a reckless disregard for its truth." [27] *Mervilus*, 73 F.4th at 194–95. "Were it otherwise, every acquittal could spawn a fabrication claim. Because this intent requirement is stringent, 'it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence.'" *Id.* (quoting *Halsey*, 750 F.3d. at 295).

Assuming that Plaintiff can bring a Fourteenth Amendment fabrication of evidence claim despite the dismissal of the Second Indictment prior to trial, the Court considers whether there is sufficient evidence supporting his claims. In this regard, at summary judgment, all reasonable inferences must be drawn in favor of the nonmoving party, but "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." *Halsey*, 750 F.3d at 287 (quotation marks omitted). Although this Court is mindful of Plaintiff's status as an incarcerated pro se litigant, it is his obligation at the summary judgment stage to direct the Court to specific factual evidence and not speculation, conjecture, or unsubstantiated conclusory allegations. *See, e.g., Brock v. International Union of Operating Engineers, Local 542 District 1*, 140 F.Supp.3d 432, 438 (E.D. Pa. 2015). "The line between

---

[27] For instance, in *Halsey*, the plaintiff's murder convictions were set aside in 2006 when "a DNA test and a follow-up investigation confirmed, beyond dispute, that Halsey was innocent[,]" and that a different individual committed the crimes. *Halsey*, 750 F.3d at 285. The plaintiff served twenty years of a sentence of two life terms in prison for the torture and murder of his partner's two young children after investigators inserted details the plaintiff could not possibly have known into a "confession" that he signed after a relentless and coercive interrogation. *Id.* at 278–82. The Third Circuit stated that it "hardly [could] conceive of a worse miscarriage of justice." 750 F.3d at 278. More recently, in *Mervilus*, 73 F.4th at 195, the Third Circuit held that there was sufficient evidence for a reasonable jury to find that the defendant "fabricated [the plaintiff's] polygraph examination" because "viewing the evidence in the light most favorable to the plaintiff],the defendant polygraph examiner "had reason to doubt his method's validity and reliability, used biased techniques to examine [the plaintiff], and rendered a conclusion not compelled by the data." *Id.*

reasonable inferences and impermissible speculation is often 'thin,'" *Halsey*, 750 F.3d at 287 (quoting *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 474 (3d Cir.1985). That line, however, "is critical because 'an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" *Id.* (citing quoting *Robertson v. Allied Signal*, Inc., 914 F.2d 360, 382 n. 12 (3d Cir. 1990). Inferences must flow directly from admissible evidence. *See Anderson*, 477 U.S. at 255. As explained below, Plaintiff's fabricated evidence claims rely on a series of strained inferences for which there is no actual evidence and on several new allegations of falsified evidence that Plaintiff did not allege in his prior complaints or disclose through discovery or in his deposition. Even viewed together, there is no "persuasive" evidence that any of the Federal or State Defendants "formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth." *Mervilus*, 73 F.4th at 194-95.

### 1. There is no Evidence that the Stewart Letter is Fabricated or that Defendants placed Stewart at the Bergan County Jail to Frame Plaintiff

In support of summary judgment, the Federal Defendants have provided evidence that the Stewart Letter was sent unsolicited to Stewart's Immigration Judge in Newark in April 2012, and that SA Coleman learned of the letter on or about May 8, 2012, prior to the Appellate Division's decision reducing Plaintiff's bail. The Defendants have provided a copy of the handwritten letter, which is stamped received by the Immigration Court. The Federal Defendants have also provided Coleman's testimony that the FBI in Newark had not worked with Stewart as an informant in the past. The record on summary judgment also contains copious evidence showing that the individual Federal Defendants investigated the Stewart Letter and conducted four interviews with Stewart to assess his reliability and corroborate his assertions and documented their discussions with him. Ultimately Stewart agreed to be a confidential source and obtained recorded conversations with Plaintiff.

In spite of this evidence, Plaintiff claims that the Federal Defendants conspired with the State Defendants to fabricate the Stewart Letter and/or plant Stewart at BCJ in order to frame him on new charges. Plaintiff emphasizes the timing of Stewart's placement at BCJ on January 24, 2012, the same date Plaintiff's co-defendant Graziano was arrested. Plaintiff was not arrested, however, until early March 2012, and therefore, the timing does not lead to the inference that Stewart was planted at the jail. Plaintiff also appears to rely on the timing of the Stewart Letter, and the subsequent federal investigation, which occurred in from May-June 2012, during the general period Plaintiff was challenging his bail determinations on the First Indictment in state court. Although the charges for the Second Indictment were filed on the same day as Plaintiff's bail source hearing, the Federal Defendants began investigating the Stewart letter several weeks before the Appellate Division reduced Plaintiff bail. As such, the timing of the Stewart Letter does not line up with Plaintiff's bail reduction. Moreover, the timing of the new charges on the date of Plaintiff's bail hearing without more, does not give rise to the inference that the new charges were fabrications.

Plaintiff also emphasizes the fact that SA Coleman eventually paid Stewart for assisting the FBI and offered him assistance with his immigration case. As explained by the Seventh Circuit, "[t]he exchange of money for information" and "promises to go easy" may be "a regrettable way of securing evidence, but it is common." *Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994). The Seventh Circuit rejected the contention "payments themselves violate the due process clause[.]"[28] *Id.* Here, the fact that the FBI eventually paid Stewart $1000.00 for his assistance and

---

[28] The Seventh Circuit noted that "[c]oncealing the payments at trial would have violated [the defendant's] rights" because "a defendant is entitled to know what the prosecutor paid for a statement (whether in cash or in lenience and related promises) so that he may expose to the jury the witness's shortcomings and bias." *Id.* (citing *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959)).

offered him assistance with his immigration case does not lead to the inference that any of the Federal Defendants paid Stewart to fabricate evidence.

Plaintiff fabrication theory also relies heavily on the fact that Stewart acted as an informant again for the FBI in 2013, after he was transferred to Buffalo, New York. It is undisputed that Stewart continued to reach out to Coleman to report new tips after Stewart was transferred to Buffalo, and, in 2013, Stewart acted as a confidential source for the FBI in Buffalo. In that case, Stewart similarly claimed that a federal inmate asked him to kill a witness in a federal death penalty case, and the FBI in Buffalo used Stewart as a confidential source to record the federal inmate making threats against the witness. The recordings made by Stewart in that case were ultimately suppressed because Stewart repeatedly brought up the federal inmate's current charges in conversations. These facts, however, do not lead to the inference that Stewart acted as an informant for the SA Coleman or the FBI prior to sending the letter to Judge Finston or that Stewart was planted by the Federal Defendants at Bergan County Jail.

Plaintiff also emphasizes the fact that the FBI withdrew its request for deferred action for Stewart and that ICE deported Stewart in early August 2013. Although it is undisputed that Stewart was subject to a final order of removal, Plaintiff claims that the Federal Defendants withdrew deferred action and had Stewart deported prior to obtaining the Second Indictment in order to deprive the grand jury of Stewart's testimony. There is no evidence to support this allegation, other than the timing of Stewart's deportation, which is not sufficient to raise this allegation above the speculative level. Moreover, SA Coleman stated in his written deposition that Stewart's deferred action was withdrawn due to concerns about his criminal history and that Costello unsuccessfully requested to delay Stewart's deportation, which undercuts Plaintiff's claim that the State Defendants wanted ICE to deport Stewart.

Plaintiff vehemently denies making threats against Delaney, telling Stewart that he wanted to kill Delaney, or asking Stewart to help him obtain a gun for anything other than self-defense. Given the evidence, it is possible that Stewart lied to FBI agents in the hopes of obtaining assistance with his immigration case. But even if Stewart fabricated or exaggerated the claims that Plaintiff wanted to kill Delaney and commit other acts of violence, "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong" *See Halsey*, 750 F.3d at 295. Therefore, this fact, standing alone, does not lead to the inference that any of the Federal or State Defendants knew or had reason to know that Stewart was lying or exaggerating.

### 2. Inspector Safier's Reports do not Support Plaintiff's Fabrication of Evidence Claims

Plaintiff also claims that the reports written by USMS Inspector Paul Safier reveal that the Federal and State Defendants privately knew that the state charges were fabricated and specious. Plaintiff, however, cherry picks language from Safier's reports, which focus primarily on determining whether Plaintiff presented a viable threat to federal assets, i.e., federal buildings and federal officials. For example, as Safier explained in his final report on July 26, 2012, the investigation revealed no evidence that Dalal had a specific or viable plot against federal assets precisely because Plaintiff's ability to conduct such a plot was merely aspirational while he was incarcerated. Moreover, Safier emphasized that the BCPO's decision to charge Plaintiff with state crimes meant he would not be able to make bail and carry out any plots against federal assets. Although Safier, in conjunction with SA Coleman and AUSA Kogan, "jointly determined that DALAL is not assessed to be a credible threat <u>to any federal asset at this time</u>" and recommended that "the protective investigation is closed as 'false/specious'", *see* USMS_17, Safier's findings have no bearing on whether the state charges were viable. Indeed, the state charges, which

involved making terroristic threats and conspiring to purchase a firearm and kill a single individual, although very serious, are very different from planning and/or carrying out a large scale attack on a federal building, and Plaintiff's continued incarceration made it extremely unlikely he would be able to carry out such a plan. For these reasons, the Court rejects Plaintiff's claim that Safier's reports constitute evidence that the Federal and State Defendants "privately" acknowledged that the state charges were fabrications.

### 3. Plaintiff has not Provided Persuasive Evidence that SA Coleman Created Fabricated Transcripts of the Audio Recordings

As part of his fabrication claim, Plaintiff further contends that SA Coleman and non-Defendant BCPO Det. Breit "created a falsified transcript" of the audio recordings between Stewart and Plaintiff. It is undisputed that Coleman did not transcribe the portions of the recordings in which Plaintiff and Stewart discussed Delaney, and Plaintiff claims those portions are exculpatory. Coleman stated in his written deposition answers that he did not transcribe those portions because they were not concerning in nature. Plaintiff points to Coleman's contemporaneous notes showing that he knew that Plaintiff and Stewart discussed Delaney in the recordings and still failed to transcribe that portion. Plaintiff further claims that several of the transcribed portions are incorrect and unfairly inculpate Plaintiff. To bring a fabrication of evidence claim against SA Coleman based on his falsification of the transcripts, Plaintiff must provide "persuasive evidence supporting a conclusion that [Coleman was] aware that evidence is incorrect or that [it was] offered in bad faith." *Black*, 835 F.3d at 372 (quoting *Halsey*, 750 F.3d at 295 (internal quotation marks omitted)). And "[e]vidence is not fabricated if it "is incorrect or simply disputed." *Mervilus*, 73 F.4th at 194 (quoting *Halsey*, 750 F.3d. at 295).

Here, Plaintiff has not provided any persuasive evidence that Coleman acted in bad faith when he left out these portions of the recording or incorrectly transcribed portions of the recorded statements that Plaintiff contends were inaudible.[29]  Moreover, these excerpts do not exculpate Plaintiff.  Although Plaintiff does not make any statements about wanting to kill or harm Delaney in these exchanges, Plaintiff repeatedly tells Stewart during the recordings that he will not discuss other potentially incriminating topics until they are out of jail.  The brief conversations about Delaney just show that Stewart was attempting to steer the conversation toward Delaney, and not that Plaintiff and Stewart never previously discussed Delaney.

#### 4. Plaintiff's Additional Allegations also Fail to Set Forth Persuasive Evidence of Fabrication

In his Certification submitted with his opposition papers, Plaintiff states that "to the best of his recollection" he did not write the handwritten documents recovered from his cell and that they are "crude" fabrications created by Defendants.  Similarly, in his deposition, he claimed that the documents are "forgeries."  These allegations are conclusory and without any evidentiary support; as such, they do not, as a matter of law, constitute persuasive evidence that the Federal and/or State Defendants fabricated any of the documents recovered from Plaintiff's cell.

Likewise, Plaintiff's new allegations against SA Jerussi—that she lied in her report and stated that Plaintiff admitted in his post-arrest interview to researching explosives and making threats against the FBI building because he felt intimidated by other inmates—also fails to meet the high threshold for a falsification of evidence claim.  As the Federal Defendants note, these allegations were not included in Plaintiff's Amended Complaint or disclosed to the Federal

---

[29] Because the BCPO relied on the recordings to obtain the new charges against Plaintiff, the Court will separately consider whether the misstatements or omission of any of these facts undermine the probable cause finding.

Defendants in discovery or during Plaintiff's deposition and border on a sham affidavit.[30]  In any event, such evidence introduced for the first time on summary judgment without explanation can hardly be persuasive evidence of fabrication.  Nor do these bare allegations give rise to the implication that the Stewart Letter was fabricated or that Plaintiff was framed on the state charges.  Plaintiff also fails to explain whether and how Jerussi's alleged falsification of his statements, which occurred after the arrest warrant was issued, were used by any of the Defendants in pursuing the state charges or otherwise prevented Plaintiff from being released on bail.

Finally, Plaintiff also alleges for the first time in a conclusory manner that State Defendants Costello and Anzilotti told him during the post-arrest interrogation that they knew that he did not threaten Delaney but that they would help him obtain bail if he admitted he did.  Although Plaintiff claims that he alleged these facts in his related federal case, the Court's review of his complaint in that action shows that Plaintiff did not allege that Costello and Anzilotti told him they knew he did not threaten Delaney.[31]  Plaintiff offers no explanation for why he waited until summary judgment

---

[30] Under the "sham affidavit doctrine," "'a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.'" *Jiminez v. All American Rathskeller*, Inc., 503 F.3d 247, 251 (2007) (quoting *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)).  The Federal Defendants point to excerpts from Plaintiff's deposition where they attempt to pin down exactly what Plaintiff's fabrication claims entail, and Plaintiff responds very generally by stating that the documents produced in discovery show that Defendants fabricated evidence.  Plaintiff disputes that these new allegations constitute a sham affidavit because they are are consistent with deposition testimony and argues that the Federal Defendants should have asked more detailed questions in his deposition.

[31] Plaintiff made similar allegations in related federal lawsuit he filed in 2013.  *See* Civ. Act. No. 13-1257 (WJM), ECF No. 1, Complaint ¶¶ 58-61. Notably, however, in that Complaint, which was filed much closer in time to the interviews, Plaintiff did not allege that Anzilotti and Costello told Plaintiff that they knew he did not threaten Delaney, and makes this claim for the first time in his Certification opposing summary judgment.  *See id.*  In his sur-reply brief, Plaintiff contends that Civ. No. 13-1257 remains stayed because it involves also claims related to the First Indictment. *See* ECF No. 268-1 at 10. Moreover, to the extent Plaintiff is attempting to raise new constitutional claims related to the interrogations in 2012, those claims would be time barred in this action.

to allege these facts. Thus, even if the Court considers this conclusory allegation, it is not the type of persuasive evidence that could sustain a fabrication of evidence claim.

For all these reasons, Plaintiff has not provided "persuasive evidence" of fabrication, and the Court grants summary judgment to the Federal and State Defendants on Plaintiff's Fourteenth Amendment fabrication of evidence claims.

### b. Fourth Amendment Malicious Prosecution Claims

In addition to his standalone fabrication of evidence claim, Plaintiff brings a Fourth Amendment malicious prosecution against the Federal and State Defendants. To survive summary judgment, Plaintiff must provide evidence that: "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendants initiated the proceeding without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) he suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding."[32]  *Geness v. Cox*, 902 F.3d 344, 355 (3d Cir. 2018) (quoting *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017)). "Under prong three, a showing of probable cause is a complete defense."[33]  *Costino v. Anderson*, 786 F. App'x. 344, 347 (3d Cir. 2019) (citing *Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016)). Courts in this district have construed and interpreted the NJCRA analogously to § 1983 *See Coles*, 162 F. Supp. 3d at 404–05

---

[32] In 2022, the Supreme Court "h[e]ld that a Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence. A plaintiff need only show that the criminal prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 49 (2022). That holding abrogated prior Third Circuit precedent. The Federal and State Defendants do not dispute that Plaintiff meets the favorable termination element.

[33] The element of malice may be inferred from a lack of probable cause. *Coles v. Carlini*, 162 F. Supp.3d 380, 403 (D.N.J., 2015) (citing *Robinson v. Jordan*, 804 F.Supp.2d 203, 206 (D.N.J. 2011)).

(collecting cases); *Carter v. Red Bank Borough*, No. 18-13537, 2019 WL 6699456, at *2 (D.N.J. Dec. 9, 2019) (same).

The record reflects that Molinelli made the final charging decision based on the information shared by the FBI. Because there is no evidence that Molinelli participated in the investigation and only made the charging decision, he is entitled to prosecutorial immunity. See *Gould v. O'Neal*, 2022 WL 17729431, at *2 (3d Cir. Dec. 16, 2022) (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976) and *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992) (internal citations omitted).

With respect to the first element, the Third Circuit has held that if an officer "influenced or participated in the decision to institute criminal proceedings," that officer can be liable for malicious prosecution. *Halsey*, 750 F.3d at 297 (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09, 317 (6th Cir. 2010)); *see also Dalal v. Molinelli*, 2021 WL 1208901, at *6 (D.N.J., 2021) (citing *Ekwunife v. City of Phila.*, 756 F. App'x 165, 169 (3d Cir. 2018)). As explained in *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (citing *Sykes*, 625 F.3d at 308–09), liability requires the officer to "participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Id.* at 660 (quoting *Sykes*, 625 F.3d at 308 n. 5); *see also Gardner v. Evans*, 920 F.3d 1038, 1065 (6th Cir. 2019).

There is insufficient evidence that Federal Defendants SA Jerussi, SA Spence, and AUSA Welle aided or influenced the charging decision. Although they participated in the federal investigation, they did not provide the results of the investigation to the BCPO or attend the June 27, 2012 meeting. There is also no evidence that State Defendant Delaney participated or aided in the charging decision. These Defendants are each entitled to summary judgment on Plaintiff's malicious prosecution claims because they were not sufficiently involved in the charging decision.

The Federal Defendants argue that SA Coleman likewise did not participate or aid the charging decision and merely met with Prosecutor Higgins and Lt. Anzilotti on the morning of June 27, 2012 and provided them with the results of the federal investigation. Viewed in the light most favorable to Plaintiff, a reasonable jury could infer from Coleman's testimony, as well as his Accomplishment Report, that he was more than a passive participant and that his presentation of the evidence, including the recordings that he transcribed, influenced the charging decision. The Court also assumes that a reasonable jury could determine that Higgins and Anzilotti aided or participated in the charging decision. Costello directly participated by presenting the oral affidavit to Judge Silebi, and the Court assumes that he too aided or participated in the charging decision.

A malicious prosecution claim also requires a plaintiff to show that the defendant initiated and pursued a criminal proceeding without probable cause. *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007) (citing *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) ). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016) (citation omitted); *see also Mervilus*, 73 F.4th at 194.

Although facts surrounding the warrant application are murky, it is undisputed that Plaintiff was rearrested pursuant to a warrant and that the arrest warrant and search warrant contained the same information. When an arrest is based on a valid warrant, courts conduct a two-pronged analysis to determine whether probable cause existed. *See Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017). The Court asks, "first, whether the officers, with at least a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for the warrant, and second, whether those assertions or omissions were material, or necessary, to the finding of

51

probable cause." *Id.* (citing *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000) (internal quotation marks and alteration omitted)).

Regarding the first element, an assertion is made with reckless disregard when "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information reported." *Id.* at 698 (quoting *Wilson*, 212 F.3d at 788). "Omissions are made with reckless disregard *where* an officer withholds a fact in his ken that any reasonable person would have known was the kind of thing the judge would wish to know." *Id.* (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) (internal quotation marks and alterations omitted)). Crucially, the focus is on "facts and circumstances within the officer's knowledge" at the time of the arrest, irrespective of later developments" *Geness*, 902 F.3d at 357 (citing *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Moreover, "the standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate." *Dempsey*, 834 F.3d at 467 (quoting *Wright v. City of Phila.*, 409 F.3d 595, 603 (3d Cir. 2005).

With respect to the second element, "when a court determines that information was asserted or omitted in an affidavit of probable cause with at least reckless disregard for the truth, it must perform a word-by-word reconstruction of the affidavit" and determine whether the reconstructed affidavit would establish probable cause. *Dempsey*, 834 F.3d at 470. In reconstructing the affidavit of probable cause,

> the role of the courts is not that of the much-maligned "Monday morning quarterback" whose critiques are made possible only by the benefits of hindsight. Rather, federal courts review the record to ensure that the proper procedure for determining probable cause was followed. If it was not, the court itself must engage that procedure and determine whether probable cause existed in spite of that failure. As we have described in prior cases, in conducting this analysis, the district court must identify any improperly asserted or omitted facts

> and, if it determines there were reckless misrepresentations or omissions, "excise the offending inaccuracies and insert the facts recklessly omitted" from the affidavit and assess whether the reconstructed affidavit would establish probable cause. *Wilson*, 212 F.3d at 789. If it would, the plaintiff's claim fails because "even if there had not been omissions and misrepresentations" in the affidavit presented to the magistrate judge, there would have been probable cause for the charges against the plaintiff. *Id.*

*Dempsey*, 834 F.3d at 469–70.

The Court has already rejected Plaintiff's standalone claim for fabrication of evidence. Plaintiff also contends, however, that the oral affidavit of probable cause contains falsehoods and reckless omissions that defeat probable cause. Specifically, he contends that the Costello falsely stated 1) that Stewart did not ask for anything related to supplying the information relative to Dalal and 2) that more than one agent, i.e., agents, determined that Stewart was credible. Plaintiff further contends that Costello recklessly omitted Stewart's extensive criminal history, including his gang membership, as well as other indicia of unreliability, such as Stewart's lack of history as an informant, and his requests for assistance with his immigration case. Plaintiff also claims that Costello recklessly omitted exculpatory evidence from recordings, namely that Plaintiff did not threaten Delaney during the recordings.[34]

From the outset, however, Plaintiff has not provided sufficient evidence that Costello or any of the State Defendants knew about Stewart's criminal history, gang membership, lack of history as an informant, or requests for assistance in his immigration case at the time they applied for the warrant. The evidence shows that SA Coleman and his supervisor SA Nawrocki met with Prosecutor Higgins and Det. Anzilotti on June 27, 2012, and provided them with the Stewart Letter, the FBI 302 Reports dated June, 1, June 21, and June 25, 2012, as well as the transcribed

---

[34] Plaintiff also argues that a portion of the recordings shows that he is unfamiliar with the location of one of the federal buildings that Stewart claimed he wanted to blow up, but that is not material to the finding of probable cause on the state charges.

recordings. The June 21, 2012 Report briefly indicated that Stewart would appreciate assistance with his underlying criminal case but also indicated that he was not asking for anything in return for his cooperation. Moreover, in their written depositions, Costello, Higgins, and Anzilotti have no recollection of the June 21, 2012 meeting and/or the charging decision. Coleman's written deposition answers do not suggest that the State Defendants had any of this information about Stewart's background when they made the charging decision. At this stage, Plaintiff must "go beyond the pleadings" and "come forward with 'specific facts showing that there [was] a genuine [dispute concerning such knowledge] for trial,'" *Geness v. Cox*, 902 F.3d 344, 357 (3d Cir. 2018) (quoting *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015), and he has not done so. As such, he cannot show that any of the State Defendants knew the above information and recklessly omitted it from the warrant.

The Federal Defendants argue generally that they are not liable under § 1983 because they are federal, not state, actors. "[T]o state a claim of liability under § 1983, [a plaintiff] must allege that [ ]he was deprived of a federal constitutional or statutory right <u>by a state actor</u>." *Dec v. Cnty. of Butler*, 2024 WL 3342436, at *2 (3d Cir. 2024) (quoting *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (emphasis in original); *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009). As the Court found in its prior decision, the Third Circuit has long held that when federal employees (e.g., FBI, ICE, or DEA agents) act jointly or in conspiracy with state actors, the federal actors are also state actors subject to § 1983 liability. *See Hindes v. FDIC*, 137 F.3d 148, 158 (3d Cir. 1998) (explaining that federal officials are subject to section 1983 liability when they act "under color of state law, for example in conspiracy with state officials"); *Melo v. Hafer*, 912 F.2d 628, 638 (3d Cir. 1990) ("federal employees who conspire with state officials to violate someone's constitutional rights are treated as acting under color of state law"), aff'd, 502 U.S. 21 (1991).

Here, there is no evidence that SA Coleman conspired with the State Defendants or any state actors to fabricate evidence against Plaintiff or maliciously prosecute him, and Plaintiff's conjecture about what may have occurred at the June 27, 2012 meeting is pure speculation. Because Plaintiff has failed to show that SA Coleman conspired with any state actors, the Court agrees that SA Coleman did not act under color of state law when he turned over the results of the federal investigation to the State Defendants. Thus, even if SA Coleman failed to provide the State Defendants with more information about Stewart's background and motives or provide the full recordings for their review, he is not liable under § 1983 because there is no evidence that he conspired with the State Defendants (or Det. Gil Breit) to conceal this information in applying for the warrant.

Moreover, in this case, the Court can also reconstruct the affidavit of probable cause to correct false or misleading content and insert omissions to the extent it is information that any judge would want to know. And, in this case, there is probable cause despite any failures. *Dempsey*, 834 F.3d at 469–70. Plaintiff claims that the affidavit omitted information showing that Stewart was unreliable. Setting aside the issues described above, the Court finds that Stewart's criminal history, gang membership, and his requests for assistance with his immigration case should have been included in the warrant, as this information speaks to Stewart's reliability and motives for providing the information about Plaintiff. The Court, therefore, reconstructs the affidavit to include the information about Stewart's criminal history and clarify that Stewart, in his initial letter, did not ask for anything, but he subsequently requested assistance with his immigration case. The Court also clarifies that the lead agent, i.e., SA Coleman, interviewed Stewart and found him credible, and provides the reasons in the record supporting Stewart's credibility.

The Court disagrees that warrant application falsely stated that the entire recording has not been "completely analyzed." This phrasing is accurate since SA Coleman only transcribed portions he found concerning, and Coleman and Breit were the only individuals who listened to the full recordings. There is no evidence that the State Defendants who made the charging decision analyzed the full recordings prior to applying for the warrant, and this statement accurately reflects that fact.

As explained in the prior section, the Court finds that the recorded conversations between Plaintiff and Stewart discussing Prosecutor Delaney are not exculpatory and do not undermine Stewart's claims that Plaintiff threatened to kill Delaney. There is no evidence that SA Coleman acted in bad faith when he failed to transcribe these short exchanges. The Court, however, reconstructs the affidavit to reflect that Plaintiff and Stewart discussed Delaney briefly and that Plaintiff did not make any threats against Delaney during those discussions.

Finally, the Court also rejects Plaintiff's arguments that the recorded conversations were exculpatory because they show that Plaintiff rejected violence and wanted to work within the system. Although Dalal stated to Stewart that killing a few "won't do much" and mentions filing lawsuits and working within the system, the conclusion of that conversation appears to reference a prior conversation Stewart claimed he had with Plaintiff about secondary attacks targeting attendees at funerals. Viewed in the light most favorable to Plaintiff, this conversation cuts both ways and suggests that Plaintiff was interested in working within the system and committing acts of violence.

The Court reconstructs the relevant portions of the affidavit as follows:

> On Monday, June 25, 2012, Special Agent Corey Coleman of the Federal Bureau of Investigation's Newark Field Office informed me that there is a confidential informant who is housed in

the Bergen County Jail Annex with Aakash Dalal and who has had daily contact and communications with him.

The confidential informant was identified as a source of information after the informant sent a letter to a Federal Judge on April 10, 2012. In the letter, the informant stated that Aakash Dalal had stated that he hated the Federal Government and Jewish people.

According to the informant, Dalal was planning an attack on a Federal building in Newark, New Jersey. The informant, who **initially** did not ask for anything related to supplying the information relative to Dalal, stated that Dalal was serious about the threat and wanted to hurt people.

On May 8, 2012, the confidential informant's letter was submitted to the FBI and Special Agents then met with and spoke to the informant on four separate occasions. **The informant is facing removal from the United States due to his criminal history, which includes eight felony convictions and gang membership. The informant asked federal agents for assistance with his immigration case and the agents told him he may receive some financial compensation for his assistance.** The lead agents **interviewed the informant and** determined that the informant and the information provided were credible **due to the level of detail and the informant's stated reasons for coming forward. The informant stated he came forward because he views terrorism differently from criminal matters, and because he feared for the safety of his immigration judge who works in the federal building Dalal threatened, and his family, who live in the vicinity.** During ~~those conversations~~ **interviews with the federal agents,** the informant ~~stated~~ **provided information suggesting** that the threats against any Federal buildings or agencies were non-specific but **stated** that Aakash Dalal did make specific his threats to kill Bergen County Prosecutor's Office Assistant Prosecutor Martin Delaney. Assistant Prosecutor Martin Delaney is the Chief Prosecutor for the Major Crimes Arson Squad and as such is the prosecutor responsible for the case involving Anthony Graziano and Aakash Dalal. Assistant Prosecutor Delaney has worked on the prosecution since its inception and has appeared in court on the State's behalf in its case against Dalal since the first appearance following Dalal's arrest.

Assistant Prosecutor Delaney has also appeared in court during hearings in which the State had opposed bail motions brought by Dalal's defense attorney.

During interviews, the informant told FBI agents that Aakash Dalal was looking to obtain a handgun. The informant also

stated that Dalal planned to flee to the Cayman Islands which he believed had no extradition treaty with the United States.

During an interview on June 21, 2012, the informant gave the agents two pieces of paper on which were written the name of Assistant Prosecutor Martin Delaney and the e-mail address ad@unelected.org. The informant stated that the name and e-mail address were written by Aakash Dalal. The informant stated that among the papers held by Dalal were also documents and "Google Earth" pictures which referred to a house in which a person who Dalal "wanted to kill" lived. The informant also stated during the interview, that Dalal wanted to make FBI Special Agent in Charge Michael Ward "pay" for stealing "100 days of Dalal's life by having him incarcerated."

On June 25, 2012 **and June 26, 2012**, agents with the FBI wired the confidential informant with a recording device to allow for the recording of a conversations between Dalal and the confidential informant. While the totality of the recordings has not been completely analyzed, Dalal is heard to discuss with the confidential informant his efforts to obtain a handgun. **Dalal and the informant also had brief conversations about Prosecutor Delaney in the recordings, but Dalal not make any threats against Delaney during those exchanges.**

*See* SONJ-BCPO-5062- SONJ-BCPO-5064 (alterations in bold added).

Here, the Court finds that the reconstructed affidavit establishes probable cause for Plaintiff's arrest on the relevant state charges. Probable cause is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). It "requires only sufficient probability, not certainty that a crime has been committed." *Geness*, 902 F.3d at 359 (3d Cir. 2018) (citing *Zimmerman*, 873 F.3d at 418-19). Probable cause must be based on "reasonably trustworthy information," *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). For cases where the affidavit is based on an informant's report, the Supreme Court applies the "totality-of-the-circumstances analysis that traditionally has informed probable cause determinations." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Reliability, veracity, and basis of knowledge are all "highly relevant," but the totality-of-the-circumstances approach means "a deficiency in one may

be compensated for . . . by some other indicia of reliability."[35] *Id.* at 230, 233. Thus, under *Gates*, "reliability is not a separate factor in a probable cause analysis and it is not a sine qua non for probable cause." *Skunda v. Pennsylvania State Police*, 47 F. App'x. 69, 73 (3d Cir. 2002).

Here, Plaintiff was already detained on multiple charges of conspiracy, arson, and bias intimidation, and the BCPO did not rearrest Plaintiff based on Stewart's tip alone. Rather, the FBI interviewed Stewart several times, received documents from Stewart corroborating his claims, and had him to wear a wire to record conversations with Plaintiff. In his interviews with the federal agents, Stewart provided detailed allegations about his conversations with Plaintiff, including specific facts about Plaintiff's desire to kill Delaney and purchase a gun from Stewart when he got out of jail. Pursuant to *Gates*, 462 U.S. at 234, an informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case." Stewart also gave the agents corroborating physical evidence in the form of handwritten notes with Delaney's name and Plaintiff's email address. And the recordings also corroborate Plaintiff's desire to obtain a handgun. *See Draper v. United States*, 358 U.S. 307, 313 (1959) (noting a tip from a confidential informant can be reliable if corroborated); *Gates*, 462 U.S. at 243–45 (reaching the same conclusion with an anonymous tip). As explained in *Gates*, 462 U.S. at 244, "[if] an informant is right about some things, he is more probably right about other facts . . . including the claim regarding [the defendants'] illegal activity." *Id.* (cleaned up); *see also U.S. v. Stearn*, 597 F.3d 540, 555-58 (3d Cir. 2010) ("tak[ing] guidance from *Gates*," and holding that affidavit supported probable cause despite absence of evidence regarding informant's reliability where police corroborated

---

[35] In *Gates*, the Supreme Court abandoned the strict requirements in *Spinelli v. United States*, 393 U.S. 410 (1969), focusing on proof of an informant's veracity or, alternatively, his reliability, favoring instead a "totality-of-the-circumstances" approach. 462 U.S. at 230–31.

informant's tip). Stewart also provided reasons for assisting the government, including his belief that terrorism was different from other criminal conduct and his concerns about his immigration judge and his family's safety, and Coleman found Stewart to be credible.

To grant summary judgment to Defendants, this Court "must conclude that 'no reasonable jury could find facts that would lead to the conclusion' that the reconstructed affidavit "lacked probable cause.'" *Andrews*, 853 F.3d at 700 (quoting *Wilson*, 212 F.3d at 792). Here, the Court finds that standard is met because any questions about Stewart's reliability or about his motives are offset by other indicia of reliability. Therefore, Federal and State Defendants are entitled to summary judgment on the malicious prosecution claims brought pursuant to § 1983 and the NJCRA.

Finally, Plaintiff's § 1983 and NJCRA claims for malicious prosecution also fail because a grand jury found probable cause. *See Costino*, 786 F. App'x. at 347. "In a malicious-prosecution suit, 'a grand jury indictment . . . constitutes prima facie evidence of probable cause.'" *Id.* (citing *Rose v. Bartle*, 871 F.2d 331, 353 (3d Cir. 1989). This "presumption of probable cause" *id.* (citing *Goodwin*, 836 F.3d at 329 n.35), applies because Dalal's prosecution "was not complete until after the grand jur[y] indicted him." *Id.* Plaintiff "'can rebut the presumption only by showing that the indictments resulted from "fraud, perjury or other corrupt means.'" *Id.* (quoting *Rose*, 871 F.2d at 353). Plaintiff claims that State and Federal Defendants falsified evidence, but the record does not support his claims. Although the warrant application omitted some facts that a judge would want to know, those omissions do not rise to the level of fabrications for all the reasons stated above and also do not undermine the probable cause.

For all these reasons, the Court finds that the Federal and State Defendants are entitled to summary judgment on § 1983 and NJCRA claims for malicious prosecution.

### c. Conspiracy Claims

The Federal and State Defendants are also entitled to summary judgment on Plaintiff's conspiracy claims under § 1983 and the NJCRA. "To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293-94 (3d Cir. 2018) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970)). "After a plaintiff establishes that the object of the conspiracy was the deprivation of a federally protected right, 'the rule is clear that' the plaintiff 'must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action.'" *Id.* at 295 (quoting *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184–85 (3d Cir. 2009). To show agreement, a plaintiff "must demonstrate that 'the state actors named as defendants in the[ ] complaint somehow reached an understanding to deny [the plaintiff] his rights,'" *Id.* (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993)). The "'meeting of the minds' or 'understanding or agreement to conspire' can be 'infer[red]' from circumstantial evidence. *Id.* (quoting *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008)).

Here, for all the reasons explained above, the record does not support Plaintiff's allegations that any of the Federal and State Defendants reached an agreement to fabricate evidence in order to prevent Plaintiff's release on bail. Nor is there any evidence that any of the Federal and State Defendants agreed to include falsehoods or omit exculpatory information when applying for the arrest warrant in order to maliciously prosecute Plaintiff. The State and Federal Defendants may have reached an agreement to monitor Plaintiff's bail proceedings and share information about new alleged criminal conduct by Plaintiff. But monitoring Plaintiff's bail status and conveying information about an investigation, without more, is lawful activity and does not amount to

"conspiratorial" conduct. *See Northrup v. Albert*, Civ. No. 09-41-V, 2011 WL 6370136, at *8 (W.D.N.C. Dec. 20, 2011) ("sharing of information by law enforcement officers in this case does not constitute a conspiracy"); *Morrison v. Sheffield*, 7:08–cv–00556, 2008 WL 5334370, at *2 (W.D. Va. Dec. 19,2008) ("The sharing of information regarding [the plaintiff's] prior convictions between federal and state law enforcement officers violates no law or implicates any of [the plaintiff's] constitutional rights. There can be no conspiracy to do what the law allows.")

Because the Federal Defendants did not conspire with any state actors to violate Plaintiff's rights, they did not act under color of state law and are entitled to summary judgment on this basis.[36] The State Defendants acted under color of state law in bringing the charges, but they are entitled to summary judgment on this claim because there is no evidence that they conspired with the Federal Defendants, Judge Silebi, or one another to violate Plaintiff's constitutional rights by fabricating evidence, applying for the arrest warrant, or bringing the new charges against Plaintiff. For these reasons, the Court grants summary judgment to the State and Federal Defendant on the § 1983 conspiracy claims.

### d. The FTCA and State Law Claims for Malicious Prosecution and Conspiracy

#### 1. The FTCA Claims Against Coleman, Jerussi, and Spence

The Amended Complaint also alleges two counts—malicious prosecution (Count IV) and conspiracy to violate civil rights in connection with the alleged malicious prosecution (Count VIII)—under a common law tort theory. *See* Am. Compl. ¶¶ 162-64, 177-79. The United States argues that it is entitled to summary judgment on Plaintiffs two FTCA claims arising from the conduct of Special Agents Coleman, Jerussi, and Spence because there is no evidence that the

---

[36] The Federal Defendants ask the Court to go further and find that federal actors can only act under color of federal law, but the Court need not, and does not, reach this issue.

Federal Defendants maliciously prosecuted Plaintiff or conspired with the State Defendants to violate his constitutional rights and the Court lacks jurisdiction over these claims under the discretionary function exception. The Court agrees.

The FTCA has not waived the government's sovereign immunity for intentional torts, including malicious prosecution, unless such claim arises out of "acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h). "Investigative or law enforcement officer" is defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id*; *see also Dalal*, 2021 WL 1208901, at *9 (explaining same). The FTCA waives the federal government's sovereign immunity for the negligent actions of its employees. *See Xi v. Haugen*, 68 F.4th 824, 837 (3d Cir. 2023) (citing *Berkovitz v. United States*, 486 U.S. 531, 535 (1988); 28 U.S.C. §§ 2671–2680). That waiver, however, is subject to certain exceptions, including the discretionary function exception. *Id*; *see also Karkalas v. Marks*, 845 F. App'x. 114, 121 (3d Cir. 2021) (same).

As explained by the Third Circuit in *Xi v. Haugen, supra,*

> The Supreme Court has enunciated a two-part test for determining if the discretionary function exception applies. First, [courts] consider the nature of the conduct and decide whether it "involv[es] an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (citation omitted). Where it does not involve judgment or choice— such as where a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow' "—the inquiry is at an end and the exception is inapplicable because the conduct is not discretionary; "the employee has no rightful option but to adhere to the directive." *Id.* (citation omitted). But where the employee does have a choice, we consider, at step two "whether that judgment is of the kind that the ... exception was designed to shield." *Id.* at 322–23, 111 S.Ct. 1267 (quotation marks omitted).

*Id.* Because "conduct cannot be discretionary if it violates the Constitution", "[f]ederal officials do not possess discretion to violate constitutional rights." *Id.* at 238 (quoting *U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988) (citation omitted). Thus, "unconstitutional government conduct is per se outside the discretionary function exception." *Id.* at 239 ("discretionary exception does not apply to conduct that violates the Constitution regardless of whether the constitutional rights at issue were 'clearly established'"). Here, as explained in detail above, there is no evidence that Coleman, Jerussi, or Spence violated Plaintiff's constitutional rights by fabricating evidence or maliciously prosecuting Plaintiff.

It is well established that the FBI's investigation of Plaintiff otherwise satisfies the discretionary function exception. "Investigation and prosecution involve judgment or choice." *See Pooler v. United States*, 787 F.2d 868, 871 (3d Cir. 1986) ("Prosecutorial decisions as to whether, when and against whom to initiate prosecution are quintessential examples of governmental discretion in enforcing the criminal law." (citations omitted)), abrogated on other grounds by *Millbrook v. United States*, 569 U.S. 50 (2013); *Bernitsky v. United States*, 620 F.2d 948, 955 (3d Cir. 1980) ("Decision making as to investigation and enforcement, particularly when there are different types of enforcement action available, are discretionary judgments."); *see also Baer v. United States*, 722 F.3d 168, 175 (3d Cir. 2013) ("Whether to pursue a lead, to request a document, or to assign additional examiners to an investigation are all discretionary decisions, which necessarily involve considerations of . . . resource allocation and opportunity costs."); *Gonzalez v. United States*, 814 F.3d 1022, 1028 (9th Cir. 2016) ("[T]he FBI has discretion in its investigative decisions. . . . We know of no statute or regulation—and Gonzalez has not directed us to any—that prescribes a course of action for the FBI and its agents to follow in the investigation of crime.").

For these reasons, the Court lacks jurisdiction over the FTCA claims, and grants summary judgment to the Federal Defendants on this basis.

## 2.  The Remaining State Law Claims

The state law malicious prosecution claims against the State Defendants fail for the same reasons that the § 1983 and NJCRA claims fail. "Under New Jersey law, malicious prosecution has four elements. Plaintiff must establish that the defendant (1) instituted proceedings (2) without probable cause and (3) with legal malice; and (4) the proceedings terminated in favor of the plaintiff." *Trabal v. Wells Fargo Armored Service Corp.*, 269 F.3d 243, 248 (3d Cir. 2001) (citing *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1197 (3d Cir. 1993)). Thus, a malicious prosecution tort claim consists of first four elements of a § 1983 claim for malicious prosecution, but the plaintiff need not show the fifth, i.e., that he suffered a deprivation of liberty. *See id; see also LoBiondo v. Schwartz*, 199 N.J. 62, 90 (2009). "Failure to prove any one of these four elements denies the plaintiff a cause of action. *Id.* (citing *Fleming v. United Parcel Service*, 642 A.2d 1029, 1030 (N.J. Super. Ct. App. Div. 1992), cert. denied, 516 U.S. 847 (1995). Because Plaintiff's malicious prosecution claims fail under § 1983 and the NJCRA, the State Defendants are also entitled to summary judgment on the malicious prosecution claims brought under state law.

Under New Jersey law, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, a principal element of which is to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177 (2005); *see also Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003). "Under New Jersey law, the elements of a claim of conspiracy to violate civil rights are essentially the same" as the elements of a § 1983 conspiracy. *See Jutrowski*, 904 F.3d at 294 n.15 (citing *Banco*

65

*Popular*, 184 N.J. at 177-78, 876 A.2d 253 (2005) ("In New Jersey . . . the principal element of [civil conspiracy] is agreement between parties to inflict wrong against or injury upon another, and an overt act that results in damage."). Thus, the resolution of Plaintiff's § 1983 conspiracy "also dictates [the court's] disposition of his state conspiracy claims." *Id.* The Court has already determined that the State Defendants are entitled to summary judgment on Plaintiff's § 1983 and NJCRA conspiracy claims, and the Court likewise grants summary judgment to the State Defendants on the state law conspiracy claims.

## IV.    **CONCLUSION**

For the reasons stated in this Opinion, the Court grants the motions for summary judgment brought by the Federal and State Defendants (ECF Nos. 222, 220). The Court will direct the Clerk of the Court to file the Opinion under temporary seal and provide the parties with 21 days to submit proposed redactions consistent with the Protective Order. An appropriate Order follows.

DATED: July 31, 2024.

Madeline Cox Arleo
United States District Judge

66